184 F.Supp. 558 (1960)
Bernard L. ALPERT, Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,
v.
EXCAVATING AND BUILDING MATERIAL CHAUFFEURS AND HELPERS LOCAL UNION NO. 379, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN OF AMERICA, Its Secretary-Treasurer, Charles A. Burns, and Its Business Agent, John J. Garvey.
Civ. A. No. 60-287.
United States District Court D. Massachusetts.
May 26, 1960.
*559 James M. Fitzpatrick, Trial Atty., and Jay E. Shanklin, Boston, Mass., for N.L. R.B.
Robert M. Segal, Boston, Mass., for all defendants.
WYZANSKI, District Judge.
The NLRB's regional director petitions for an injunction pursuant to § 10(l) of the amended NLR Act. 61 Stat. 149, 73 Stat. 544, 29 U.S.C.A. § 160(l). He claims that there is reasonable cause to believe that respondents have engaged in two different types of so-called secondary conduct proscribed by § 8(b) (4) of the Act as amended by the Labor-Management Reporting and Disclosure Act of 1959. Act of Sept. 14, 1959. Pub.L. 86-257, 29 U.S.C.A. § 158(b) (4). The two types of conduct may conveniently be called prohibited inducements [covered by § 8(b) (4) (i), 29 U.S.C.A. § 158(b) (4) (i)], and prohibited threats [covered by § 8(b) (4) (ii), 29 U.S.C.A. § 158(b) (4) (ii)]. The crucial statutory provisions follow.

*560 "It shall be an unfair labor practice for a labor organization or its agents  * * *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
* * * * * *
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 * * *."
This case presents the problem whether in their effort to require Consalvo Trucking Inc. to recognize and bargain with Local 379, respondents exerted unlawful pressure upon other persons concerned with two entirely different projects, one for the construction of the East Boston Tunnel and the other for the construction of the Boston Common Garage.
The material facts and conclusions of law can best be stated separately with respect to respondents' activities at the two different sites.
Consalvo Trucking Inc. is a corporation purchasing and trucking fill dirt. The parties have conceded that its activities affect commerce.
Consalvo has no contract with Local 379. Some of Consalvo's employees are suspended members of Local 379 to whom Consalvo pays less than union rates. From November 1959 until at least April 1960, Local 379 has vainly sought to get Consalvo to execute a union contract. To induce Consalvo to sign an agreement, Local 379 resorted to economic pressure first at the East Boston Tunnel job and then at the Boston Common Garage job.
Perini Corporation has a general contract to construct the East Boston Tunnel. Perini and other members of an employer association are parties to a collective bargaining contract with Local 379 and other locals of the Teamsters' Union. The contract provides, in Articles III and IX, for union membership and union wages. In Article XIV, paragraph 2 it provides that "If an individual employer shall sub-contract work as herein defined, provisions shall be made in such sub-contract for the observance by said sub-contractor of the terms of this agreement."
Perini made a sub-contract with Consalvo to use its trucks and drivers to remove dirt from the tunnel project.
To remonstrate against alleged violation of the agreement between Perini and Local 379, Garvey, the local's business agent, waited upon Dunne on Friday, April 15, 1960. Dunne was the superintendent at the North End of the tunnel site. He had authority to hire and fire, to hear grievances, and to handle routine operational problems arising out of sub-contracts. Dunne had the right to consult Perini's vice-president, Richardson, before acting. But Dunne had adequate authority without such consultation to terminate Perini's contract with Consalvo.
Garvey did not threaten Dunne. He merely called to Dunne's attention the fact that Consalvo was using suspended union members and not observing union conditions. Dunne sent for a Consalvo representative to confer with representatives of Local 379. Thereafter, on Monday, April 18, Garvey told Dunne that Consalvo had still not executed a union *561 contract. On Wednesday, April 20, Dunne used Consalvo. On Thursday, after consultation with vice-president Richardson, Dunne terminated Consalvo's sub-contract. In so doing, Dunne acted in response not to any coercion but solely to his view of what was called for by Perini's contract and Perini's operating policies.
As a matter of law, there is no reasonable basis for concluding that in connection with the East Boston Tunnel project any of the respondents violated either of the quoted sub-sections of the Labor Management Reporting and Disclosure Act of 1959.
There is not the slightest basis for finding that any respondent attempted "to threaten, coerce, or restrain" in violation of § 8(b) (4) (ii).
Nor is there any basis for finding that any respondent violated § 8(b) (4) (i). No doubt, Garvey, acting for Local 379, did "induce" an "individual" to wit Dunne to discontinue the Consalvo contract. But there are two reasons why this inducement was not a violation of § 8(b) (4) (i) of the Act.
First, the letter of § 8(b) (4) (i) is inapplicable. When Garvey encouraged Dunne to terminate the subcontract, Garvey was not, in the precise language of § 8(b) (4) (i), inducing Dunne not to use, handle, or work on goods, or not to perform services. Only in a colloquial sense can it be said that Dunne or Perini was using Consalvo's trucks. Strictly speaking, Perini had a sub-contract with Consalvo for the latter to use his trucks or other trucks in carting dirt. Unlike § 8(b) (4) (ii) (B), § 8(b) (4) (i) has not within its scope conduct which has merely the object of persuading another to cease doing business. Section 8(b) (4) (i) is concerned with appeals addressed to those who perform services manually or clerically, or who manually use goods, or who have minor supervisory functions. It does not cover appeals to those who on behalf of their employer have power lawfully to terminate, cease, or otherwise control business relations with the so-called primary employer.
Second, quite apart from the letter of the statute, other considerations indicate that Congress had no intention of preventing a union or its representatives from addressing non-coercive pleas to employers or to individuals who had authority on behalf of the employer to make and terminate contracts. In labor legislation Congress has always been mindful that the First Amendment to the United States Constitution protects freedom of speech. See N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Thus Congress in the Taft-Hartley Act, 61 Stat. 142, added to the National Labor Relations Act § 8(c), 29 U.S.C.A. § 158 (c) which provides that:
"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any provisions of this Act, if such expression contains no threat of reprisal or force or promise or benefit."
In enacting the LMRDA in 1959, Congress did not purport to alter the provisions of § 8(c). Moreover, no legislative history has been drawn to my attention which indicates that Congress sought to preclude a union from making to an appropriate representative of management a non-threatening plea that the employer should abide by its valid contracts.
In the case at bar, there is no doubt that the plea to Dunne sought compliance with a valid contract. For the first proviso to § 8(e) of the Act, 29 U.S.C.A. § 158(e) specifically permits just such a "hot cargo" contract as Perini had signed. Indeed the validity of the contract is not questioned by any party in this case.
The point made by the petitioner is that, although the hot cargo contract was valid, Dunne was not an appropriate management representative to whom the *562 plea should be addressed. But that point is without merit. As shown above, Perini gave Dunne authority to cancel the Consalvo sub-contract. Having such authority, Dunne was a proper person for the respondents to seek to influence by peaceful non-coercive arguments.
But it was not by similar arguments that respondents approached those concerned with the Boston Common Garage project. And it now becomes appropriate to state the facts with respect to that project.
Foundation Company of New York has a prime contract for the construction of that garage. Foundation made a sub-contract with Jeremiah Sullivan Sons, Inc. for the excavation and removal of dirt. In turn, Sullivan made a sub-contract with Ox-Bow Inc. to remove and dispose of this dirt. Ox-Bow sold this dirt to Consalvo. Some of this dirt Consalvo transported in its own trucks. The remainder of the dirt, Ox-Bow delivered, to points indicated by Consalvo, by trucks of third persons with whom Ox-Bow had contracts.
April 18, 1960 McMorrow, president of Local 379, at a meeting attended by Edward J. Ryan, Sullivan's engineer on the project, and by Donald Ryan, Ox-Bow's president, said that every truck used on the Boston Common Garage project would have to be a union truck or none of the union drivers would work at that project. McMorrow used this language with the intent of threatening Sullivan and Ox-Bow that such of their or their sub-contractors' employees as belonged to Local 379 would cease work if Consalvo's trucks were allowed to cart fill from the Boston Common project.
April 20, Burns, secretary-treasurer of Local 379, went to the Common. He talked to Edward J. Ryan (Sullivan's engineer), to Hathaway (a free lance who gave directions to Ox-Bow's employees), and to Flagg who was an Ox-Bow employee whose duty it was to approve the weight of fill taken in each truck before he allowed it to leave the premises. To all these men Burns made it plain that Local 379 men would not work for Sullivan or Ox-Bow or their sub-contractors if Consalvo, while it had no contract with Local 379, was allowed to use his trucks and employees to transport earth from the garage site. In the face of this warning, Flagg thereafter refused to allow Consalvo's trucks to transport fill from the Common.
The statements of McMorrow and Burns were threats. They were addressed to Sullivan and Ox-Bow and their representatives and employees. These included persons who, according to the stipulation of the parties, were engaged in commerce or in an industry affecting commerce. Objects of the threats were to require Consalvo to bargain with Local 379 and to force the employees of Sullivan and Ox-Bow and all others at the Boston Common to cease delivering dirt to Consalvo's trucks. Thus there was a clear-cut violation of § 8(b) (4) (ii) (B) of the Act. And against repetition of such threats and coercive tactics petitioner is entitled, as against each of respondents except Garvey, to an injunction under § 10(l) of the Act. Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186; N. L. R. B. v. Bangor Bldg. Trades Council, 1 Cir., 1960, 278 F.2d 287.
There is no reason to withhold injunctive relief in a case where the statutory violation was so plain, knowing, and inexcusable. On the other hand, there is no reason to make the injunction extend beyond the type of threatening conduct proscribed by § 8(b) (4) (ii) (B). This is the only type of unlawful conduct in which this Court has found the union or its representatives to have engaged. On this record petitioner is not entitled to have the union enjoined from attempts at influence through non-coercive arguments, since, so far as appears, it addressed such non-coercive arguments only to appropriate persons with adequate authority lawfully to remedy the evil of which complaint was made.