377 U.S. 46 (1964)
NATIONAL LABOR RELATIONS BOARD
v.
SERVETTE, INC.
No. 111.
Supreme Court of United States.
Argued February 19, 1964.
Decided April 20, 1964.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.
*47 Solicitor General Cox argued the cause for petitioner. With him on the brief were Philip B. Heymann, Arnold Ordman, Dominick L. Manoli and Norton J. Come.
Stanley E. Tobin argued the cause for respondent. With him on the briefs was Carl M. Gould.
Duane B. Beeson filed a brief for the American Federation of Television and Radio Artists et al., as amici curiae, urging reversal.
MR. JUSTICE BRENNAN delivered the opinion of the Court.
Respondent Servette, Inc., is a wholesale distributor of specialty merchandise stocked by retail food chains in Los Angeles, California.[1] In 1960, during a strike which Local 848 of the Wholesale Delivery Drivers and Salesmen's Union was conducting against Servette, the Local's representatives sought to support the strike by asking managers of supermarkets of the food chains to discontinue handling merchandise supplied by Servette. In most instances the representatives warned that handbills asking the public not to buy named items distributed by Servette would be passed out in front of stores which refused to cooperate, and in a few cases handbills were *48 in fact passed out.[2] A complaint was issued on charges by Servette that this conduct violated subsections (i) and (ii) of § 8 (b) (4) of the National Labor Relations Act, as amended,[3] which, in relevant part, provide that it is an unfair labor practice for a union
"(i) . . . to induce or encourage any individual employed by any person . . . to engage in . . . a refusal in the course of his employment to . . . handle . . . commodities or to perform any services; or"
"(ii) to threaten, coerce, or restrain any person . . . where in either case an object thereof is
.....
"(B) forcing or requiring any person to cease . . . dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . .
.....

*49 Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer . . . ."
The National Labor Relations Board dismissed the complaint. The Board adopted the finding of the Trial Examiner that "the managers of McDaniels Markets were authorized to decide as they best could whether to continue doing business with Servette in the face of threatened or actual handbilling. This, a policy decision, was one for them to make. The evidence is persuasive that the same authority was vested in the managers of Kory." 133 N. L. R. B. 1506. The Board held that on these facts the Local's efforts to enlist the cooperation of the supermarket managers did not constitute inducement of an "individual" within the meaning of that term in subsection (i); the Board held further that the handbilling, even if constituting conduct which "threaten[s], coerce[s], or restrain[s] any person" under subsection (ii), was protected by the quoted proviso to amended § 8 (b) (4). 133 N. L. R. B. 1501. The Court of Appeals set aside the Board's order, holding that the term "individual" in subsection (i) was to be read literally, thus including the supermarket managers, and that the distributed products were not "produced" by Servette within the meaning of the proviso, thus rendering its protection unavailable. 310 F. 2d 659. We granted certiorari, 374 U. S. 805. We reverse the judgment of the Court of Appeals.
The Court of Appeals correctly read the term "individual" in subsection (i) as including the supermarket *50 managers,[4] but it erred in holding that the Local's attempts to enlist the aid of the managers constituted inducement of the managers in violation of the subsection. The 1959 statute amended § 8 (b) (4) (A) of the National Labor Relations Act,[5] which made it unlawful to induce or encourage "the employees of any employer" to strike or engage in a "concerted" refusal to work. We defined the central thrust of that statute to be to forbid "a union to induce employees to strike against or to refuse to handle goods for their employer when an object is to force him or another person to cease doing business with some third party." Local 1976, Carpenters' Union v. Labor Board, 357 U. S. 93, 98. In the instant case, however, the Local, in asking the managers not to handle *51 Servette items, was not attempting to induce or encourage them to cease performing their managerial duties in order to force their employers to cease doing business with Servette. Rather, the managers were asked to make a managerial decision which the Board found was within their authority to make. Such an appeal would not have been a violation of § 8 (b) (4) (A) before 1959, and we think that the legislative history of the 1959 amendments makes it clear that the amendments were not meant to render such an appeal an unfair labor practice.
The 1959 amendments were designed to close certain loopholes in the application of § 8 (b) (4) (A) which had been exposed in Board and court decisions. Thus, it had been held that the term "the employees of any employer" limited the application of the statute to those within the statutory definitions of "employees" and "employer." Section 2 (2) of the National Labor Relations Act defines "employer" to exclude the federal and state governments and their agencies or subdivisions, nonprofit hospitals, and employers subject to the Railway Labor Act. 29 U. S. C. § 152 (2). The definition of "employee" in § 2 (3) excludes agricultural laborers, supervisors, and employees of an employer subject to the Railway Labor Act.[6] 29 U. S. C. § 152 (3). Furthermore, *52 since the section proscribed only inducement to engage in a strike or "concerted" refusal to perform services, it had been held that it was violated only if the inducement was directed at two or more employees.[7] To close these loopholes, subsection (i) substituted the phrase "any individual employed by any person" for "the employees of any employer," and deleted the word "concerted." The first change was designed to make the provision applicable to refusals by employees who were not technically "employees" within the statutory definitions, and the second change was intended to make clear that inducement directed to only one individual was proscribed.[8] But these changes did not expand the type of conduct which § 8 (b) (4) (A) condemned, that is, union pressures calculated to induce the *53 employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer.[9]
Moreover, the division of § 8 (b) (4) into subsections (i) and (ii) by the 1959 amendments has direct relevance to the issue presented by this case. It had been held that § 8 (b) (4) (A) did not reach threats of labor trouble made to the secondary employer himself.[10] Congress *54 decided that such conduct should be made unlawful, but only when it amounted to conduct which "threaten[s], coerce[s] or restrain[s] any person"; hence the addition of subsection (ii). The careful creation of separate standards differentiating the treatment of appeals to the employees of the secondary employer not to perform their employment services, from appeals for other ends which are attended by threats, coercion or restraint, argues conclusively against the interpretation of subsection (i) as reaching the Local's appeals to the supermarket managers in this case.[11] If subsection (i), in addition to prohibiting inducement of employees to withhold employment services, also reaches an appeal that the managers exercise their delegated authority by making a business judgment to cease dealing with the primary employer, subsection (ii) would be almost superfluous. Harmony between (i) and (ii) is best achieved by construing subsection (i) to prohibit inducement of the managers to withhold their services from their employer, and subsection (ii) to condemn an attempt to induce the exercise of discretion only if the inducement would "threaten, coerce, or restrain" that exercise.[12]
We turn finally to the question whether the proviso to amended § 8 (b) (4) protected the Local's handbilling. *55 The Court of Appeals, following its decision in Great Western Broadcasting Corp. v. Labor Board, 310 F. 2d 591 (C. A. 9th Cir.), held that the proviso did not protect the Local's conduct because, as a distributor, Servette was not directly involved in the physical process of creating the products, and thus "does not produce any products." The Board on the other hand followed its ruling in Lohman Sales Co., 132 N. L. R. B. 901, that products "produced by an employer" included products distributed, as here, by a wholesaler with whom the primary dispute exists. We agree with the Board. The proviso was the outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded. We elaborated the history of the proviso in Labor Board v. Fruit & Vegetable Packers, Local 760, post, p. 58, decided today. It would fall far short of achieving this basic purpose if the proviso applied only in situations where the union's labor dispute is with the manufacturer or processor. Moreover, a primary target of the 1959 amendments was the secondary boycotts conducted by the Teamsters Union, which ordinarily represents employees not of manufacturers, but of motor carriers.[13] There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which it is an exception, and we see no basis for attributing such an incongruous purpose to Congress.
The term "produced" in other labor laws was not unfamiliar to Congress. Under the Fair Labor Standards Act, the term is defined as "produced, manufactured, mined, handled, or in any other manner worked on . . . ," *56 29 U. S. C. § 203 (j), and has always been held to apply to the wholesale distribution of goods.[14] The term "production" in the War Labor Disputes Act has been similarly applied to a general retail department and mailorder business.[15] The Court of Appeals' restrictive reading of "producer" was prompted in part by the language of § 8 (b) (4) (B), which names as a proscribed object of the conduct defined in subsections (i) and (ii) "forcing or requiring any person to cease . . . dealing in the products of any other producer, processor, or manufacturer." (Italics supplied.) In its decision in Great Western Broadcasting Corp. v. Labor Board, supra, the Court of Appeals reasoned that since a "processor" and a "manufacturer" are engaged in the physical creation of goods, the word "producer" must be read as limited to one who performs similar functions. On the contrary, we think that "producer" must be given a broader reach, else it is rendered virtually superfluous.
*57 Finally, the warnings that handbills would be distributed in front of noncooperating stores are not prohibited as "threats" within subsection (ii). The statutory protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself protected.
Reversed.
NOTES
[1] The supermarket chains principally involved were Kory's Markets, Inc., and McDaniels Markets. The testimony mentioned only one other chain, Daylight Markets, one of whose store managers made an unsworn statement that he was interviewed on one occasion, and that although he refused to cooperate, the Local did not handbill at his store. Servette's products are primarily candy, liquor, holiday supplies and specialty articles.
[2] The handbill was as follows:

"To the Patrons of This Store
"Wholesale Delivery Drivers & Salesmen's Local No. 848 urgently requests that you do not buy the following products distributed by Servette, Inc.:
"Branch's Candy
"Servette Candy
"Good Season Salad Dressing
"Old London Products
"The Servette Company which distributes these products refuses to negotiate with the Union that represents its drivers. The Company is attempting to force the drivers to sign individual `Yellow Dog' contracts.
"These contracts will destroy the wages and working conditions that the drivers now enjoy, and will set them back 20 years in their struggle for decent wages and working conditions.
"The drivers of Servette appreciate your cooperation in this fight."
[3] As amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) § 704 (a), 73 Stat. 542-543, 29 U. S. C. (Supp. IV, 1963) § 158 (b) (4).
[4] The Board reached a contrary conclusion on the authority of its decision in Carolina Lumber Co., 130 N. L. R. B. 1438, 1443, which viewed the statute as distinguishing "low level" supervisors from "high level" supervisors, holding that inducement of "low level" supervisors is impermissible but inducement of "high level" supervisors is permitted. We hold today that this is not the distinction drawn by the statute; rather, the question of the applicability of subsection (i) turns upon whether the union's appeal is to cease performing employment services, or is an appeal for the exercise of managerial discretion.
[5] Section 8 (b) (4) of the National Labor Relations Act, 61 Stat. 140, 141, 29 U. S. C. § 158 (b) (4), read as follows:

"SEC. 8 (b). It shall be an unfair labor practice for a labor organization or its agents
.....
"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."
[6] In view of these definitions, it was permissible for a union to induce work stoppages by minor supervisors, and farm, railway or public employees. See Ferro-Co Corp., 102 N. L. R. B. 1660 (supervisors); Arkansas Express, Inc., 92 N. L. R. B. 255 (supervisors); Conway's Express, 87 N. L. R. B. 972, 980, aff'd, 195 F. 2d 906, 911 (C. A. 2d Cir.) (supervisors); Great Northern R. Co., 122 N. L. R. B. 1403, enforcement denied, 272 F. 2d 741 (C. A. 9th Cir.), and supplemental Board decision, 126 N. L. R. B. 57 (railroad employees); Smith Lumber Co., 116 N. L. R. B. 1756, enforcement denied, 246 F. 2d 129, 132 (C. A. 5th Cir.) (railroad employees); Paper Makers Importing Co., Inc., 116 N. L. R. B. 267 (municipal employees). Compare Di Giorgio Fruit Corp., 87 N. L. R. B. 720, 721, enforced, 89 U. S. App. D. C. 155, 191 F. 2d 642, cert. denied, 342 U. S. 869 (agricultural labor organization).
[7] See Joliet Contractors Assn. v. Labor Board, 202 F. 2d 606, 612 (C. A. 7th Cir.), cert. denied, 346 U. S. 824; cf. Labor Board v. International Rice Milling Co., 341 U. S. 665, 671.
[8] The changes made in § 8 (b) (4) (A) by subsection (i) first appeared in the Administration bill, which was introduced by Senator Goldwater. See § 503 (a) of S. 748, I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 142. The Secretary of Labor testified that the change would cure the situation whereby unions could "avoid the existing provisions by inducing individual employees, or workers not defined as employees by the act such as railroad and agricultural workersto refuse to handle the products of the person with whom they want the employer to cease doing business." Hearings before the Senate Subcommittee on Labor and Public Welfare on S. 505, etc., 86th Cong., 1st Sess., p. 265. The Landrum-Griffin bill introduced in the House contained a subsection (i) similar to that of the Administration bill. Section 705 (a) of H. R. 8400, I Leg. Hist. 680. An analysis submitted by its sponsors explained the purpose of the amendment as had the Secretary of Labor, and added that the omission of the word "concerted" was to prevent the unions from inducing employees one at a time to engage in secondary boycotts. 105 Cong. Rec. 14347, II Leg. Hist. 1522-1523. See also 105 Cong. Rec. 15531-15532 (Congressman Griffin), II Leg. Hist. 1568.
[9] Thus, the following colloquy occurred between Secretary of Labor Mitchell and Senator Kennedy with respect to the provision of the Administration bill analogous to § 8 (b) (4) (ii):

"Senator KENNEDY. Mr. Secretary . . .
"I would like to ask you a question regarding section 503 (a) of your bill: There is a manufacturer of clothing `A.' He begins to purchase the products of a plant which is under the domination of racketeers. . . . Would it be a violation of section 503 of your bill if the business agent of the Clothing Workers Union at company A spoke to the plant manager and requested him not to order materials nonunion materialsfrom the racketeer plant in Pennsylvania?
"Secretary MITCHELL. We don't think it would be, Senator.
"Senator KENNEDY. Now, supposing the plant in Pennsylvania was a nonunion plant, would it be a violation under your bill for union leaders in another company to go to his plant manager and ask him not to buy goods from the nonunion plant?
"Secretary MITCHELL. Request him not to buy? No.
"Senator KENNEDY. Now, if the representative of the union at plant A told the manufacturer that the members of the union would not continue to work on goods which were secured from the racketeer's shop?
"Secretary MITCHELL. In that case, it is my interpretation of our proposal that that would be coercion. And our proposal prohibits coercion for the purpose of bringing pressure on an employer not to buy merchandise from a neutral third party." Hearings before the Senate Subcommittee on Labor and Public Welfare on S. 505, etc., 86th Cong., 1st Sess., pp. 304-305.
[10] See Sealright Pacific, Ltd., 82 N. L. R. B. 271, 272, n. 4; Rabouin v. Labor Board, 195 F. 2d 906, 911-912 (C. A. 2d Cir.); Labor Board v. International Union of Brewery Workers, 272 F. 2d 817, 819 (C. A. 10th Cir.).
[11] Accord, Labor Board v. Local 294, Teamsters, 298 F. 2d 105 (C. A. 2d Cir.); and see Alpert v. Local 379, Teamsters, 184 F. Supp. 558 (D. C. D. Mass.).
[12] The Conference Committee in adopting subsection (ii) understood that the subsection would reach only threats, restraints or coercion of the secondary employer and not a mere request to him for voluntary cooperation. Senator Dirksen, one of the conferees, stated that the new amendment "makes it an unfair labor practice for a union to try to coerce or threaten an employer directly (but not to persuade or ask him) in order . . . To get him to stop doing business with another firm or handling its goods." 105 Cong. Rec. 19849, II Leg. Hist. 1823. (Italics supplied.)
[13] See, e. g., 105 Cong. Rec. 1730, II Leg. Hist. 993-994; 105 Cong. Rec. 6105, II Leg. Hist. 1028; 105 Cong. Rec. 6669, II Leg. Hist. 1196; 105 Cong. Rec. 3926-3927, II Leg. Hist. 1469-1470; 105 Cong. Rec. 15544, II Leg. Hist. 1580.
[14] See, e. g., Mitchell v. Pidcock, 299 F. 2d 281 (C. A. 5th Cir.); McComb v. Wyandotte Furniture Co., 169 F. 2d 766 (C. A. 8th Cir.); McComb v. Blue Star Auto Stores, 164 F. 2d 329 (C. A. 7th Cir.); Walling v. Friend, 156 F. 2d 429 (C. A. 8th Cir.); Walling v. Mutual Wholesale Food Co., 141 F. 2d 331, 340 (C. A. 8th Cir.).
[15] United States v. Montgomery Ward & Co., 150 F. 2d 369 (C. A. 7th Cir.).

We attach no significance to the fact that another version of the proviso read:
"Provided, That nothing contained in this subsection (b) shall be construed . . . to prohibit publicity for the purpose of truthfully advising the public (including consumers) that an establishment is operated, or goods are produced or distributed, by an employer engaged in a labor dispute . . . ." 105 Cong. Rec. 17333, II Leg. Hist. 1383.
This version was in a request by the Senate conferees for instructions but was not made the subject of debate or vote because Senate and House conferees reached agreement on the proviso.