George SQUILLACOTE, Regional Director of the Thirtieth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BUILDING AND CONSTRUCTION TRADES COUNCIL OF FOND DU LAC COUNTY,

and

Local #126, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,

and

Local #32, Bricklayers, Masons and Plasterers International Union of America,

and

Local #1086, International Hod Carriers, Building and Common Laborers Union of America,

and

Local #782, United Brotherhood of Carpenters and Joiners of America,

and

Local #501, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada,

and

Local #362, Sheet Metal Workers' International Association, Respondents.

Nos. 67–C–100, 67–C–105.

United States District Court
E. D. Wisconsin.

May 1, 1967.

Eugene G. Goslee and Carl B. Frankel, N.L.R.B., Milwaukee, Wis., for petitioner.

John P. McCrory, Melli, Smith & Shiels & McCrory, Madison, Wis., Attorneys for Charging Parties Goldberg, Previant & Uelmen, Milwaukee, Wis., for respondents.

MYRON L. GORDON, District Judge.

The two cases reflected in the caption were consolidated for purposes of hearing and argument.

The difficulty presented by the principal problem in this case was recognized by the Supreme Court in United Steelworkers of America v. National Labor Relations Board, 376 U.S. 492, on page 496, 84 S.Ct. 899, on page 902, 11 L. Ed.2d 863 (1964), referred to as the *Carrier Case,* where the court stated:

> "The dividing line between forbidden secondary activity and protected primary activity has been the subject of intense litigation both before and after the 1959 amendments to § 8(b) (4), which broadened the coverage of the section but also added the express exceptions for the primary strike and primary picketing. We need not detail the course of this sometimes confusing litigation."

In Local 761, International Union of Electrical, Radio & Machine Workers v. National Labor Relations Board, 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed. 2d 592 (1961), referred to as the *General Electric Case,* Justice Frankfurter also noted the burdens presented by this type of case:

> "Important as is the distinction between legitimate 'primary activity'

and banned 'secondary activity,' it does not present a glaringly bright line."

The dilemma involved is one of attempting to preserve for laboring men their right to free expression and their traditional privilege of picketing for that purpose; on the other hand, Congress has evidenced its desire to protect third parties from being enmeshed in disputes with which they are otherwise not concerned.

The size of the problem was very recently discussed by the Supreme Court in a decision announced on April 17, 1967 in National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357. Mr. Justice Brennan, on behalf of the court, asserted the following, at page 1258 of 87 S.Ct.:

"Judicial decisions interpreting the broad language of § 8(b) (4) (A) of the Taft-Hartley Act uniformly limited its application to such 'secondary' situations. This limitation was in 'conformity with the dual Congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.' National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, [71 S.Ct. 943, 95 L.Ed. 1284]. This Court accordingly refused to read § 8(b) (4) (A) to ban traditional primary strikes and picketing having an impact on neutral employers even though the activity fell within its sweeping terms. National Labor Relations Board v. Union of International Rice Milling Co., 341 U.S. 665, [71 S.Ct. 961, 95 L. Ed. 1284]; see Local 761, International Electrical, Radio & Machine Workers Union v. National Labor Relations Board, 366 U.S. 667, [81 S.Ct. 1285, 6 L.Ed.2d 592]. Thus, however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective.

"The literal terms of § 8(b) (4) (A) also were not applied in the so-called 'ally doctrine' cases, in which the union's pressure was aimed toward employers * * * striking employees. The rationale, again, was the inapplicability of the provision's central theme, the protection of neutrals against secondary pressure, where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute. '[T]he union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it." Douds v. Metropolitan Federation of Architects, 75 F.Supp. 672, 677 (D.C.S.C. N.Y. 1948) (Rifkind, J.); see National Labor Relations Board v. Business Machine & Office Appliance Mechanics, 228 F.2d 553 (C.A. 2d Cir. 1955). We summarized our reading of § 8 (b) (4) (A) just a year before enactment of § 8(e):

'It aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusal to handle goods.' Local 1976, United Brotherhood of Carpenters, etc. v. National Labor Relations Board (Sand Door), 357 U.S. 93, 100, [78 S.Ct. 1011, 1017, 2 L.Ed.2d 1186]."

In Mr. Fenton's case, which relates to the construction of a housing project known as Forest Manor, the representatives of the Labor Board contend that the respondents have conducted a secon-

dary boycott in violation of Sec. 8(b) (4) (i) (ii) of the National Labor Relations Act. The regional director of this region of the Labor Board has applied for a temporary injunction pending a final disposition of the issues by the Labor Board upon charges before it filed by Mr. Fenton.

In Mr. Peter's case, relating to the renovation of a facility known as the Old Bus Barn, the petitioner, on behalf of the Labor Board, makes similar charges as in Mr. Fenton's case and, in addition, asserts a violation of Sec. 8(b) (7) (C) of the National Labor Relations Act. The latter charge is based on the contention that the respondents have picketed the Old Bus Barn for more than 30 days with the objective of gaining union recognition.

To support his claims, the petitioner has offered testimony from numerous witnesses and presented documentary proof to suggest that various pressures were applied by the respondents upon subcontractors and their employees. The petitioner contends that upon the record, he has met the burden of showing reasonable cause to believe that such subcontractors and their employees were unlawfully "enmeshed".

For example, regarding the Forest Manor project, the petitioner points to the fact that Mr. Schommer, an electrical subcontractor, was told that his men would be penalized if they crossed the picket line. Mr. Gyr, another subcontractor, was told he might be fined for that type of activity. Mr. Morgen, a mason contractor, was told that he could be fined if he crossed the picket line. An apprentice for Mr. Morgan, Julka, testified that he was told by Mr. McEvoy that he could be fined for crossing the picket line.

The respondents contend that they had a right to advertise the substandard conditions which were endured by employees of Mr. Fenton and Mr. Peters. A letter from one of the respondents was sent

to Mr. Fenton advising him that his employees were receiving substandard benefits. Mr. Fenton testified that if he paid union scale, he would become uncompetitive in the Fond du Lac area.

The respondents also maintain that the picketing in the cases at bar is protected by reason of its qualifying under the so-called Moore Dry Dock standards, which were established in Seafarers International Union of North America, Atlantic & Gulf District, Harbor and Inland Waterways Division, AFL-CIO v. National Labor Relations Board, 105 U.S. App.D.C. 211, 265 F.2d 585 (1959). In that case, the board observed, at page 589, that where a secondary employer functioned on the situs of a dispute between a union and a primary employer, neither the right of the union to picket nor of the secondary employer to be free therefrom could be considered absolute.

It is the respondents' argument that under the Moore Dry Dock standards, the picketing of premises which are common to both a primary employer and a secondary employer is lawful if confined to the common situs or to places reasonably close thereto and to times when the primary employer is actively engaged in its normal business at the situs and, in addition, if the picketing discloses with clarity that the dispute is with the primary employer. In essence, the respondents' contention is that Sec. 8(b) (4) must be interpreted to permit picketing at a primary employer's premises even though it results in pressure upon a neutral employer who is engaged in work at the common situs.

The Moore Dry Dock standards were described as follows in the *General Electric Case*, 366 U.S. at page 677, 81 S.Ct. at page 1291:

"It set out four standards for picketing in such situations which would be presumptive of valid primary activity: (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2)

that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute was only with the primary employer. These tests were widely accepted by reviewing federal courts."

At page 679, 81 S.Ct. at page 1292 of the *General Electric Case*, the court made the following comment:

"The application of the *Dry Dock* tests to limit the picketing effects to the employees of the employer against whom the dispute is directed carries out the 'dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.'"

In the *General Electric Case*, at page 673, 81 S.Ct. at page 1289, the court distinguished between legal and illegal picketing in the following terms:

"But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer."

In support of its contention that the picketing was lawful at both the Fenton and Peters projects, the respondents maintain that the primary picketing at those locales was protected under the statutes, and the respondents further contend that they were entitled to make appeals to subcontractors and their employees at the common situs and to urge them not to go into the common working area at a time when the primary contractors' own employees were upon the job. The unions argue that the appeal to the employees of the subcontractors was substantially like the appeal to store managers made in National Labor Relations Board v. Servette, 377 U.S. 46, 47, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964).

Picketing is not always legal merely because it occurs at a common situs. In the *General Electric Case*, 366 U.S. at page 679, 81 S.Ct. at page 1292, the court said:

"In rejecting the ownership test in situations where two employers were performing work upon a common site, the Board was naturally guided by this Court's opinion in *Rice Milling*, in which we indicated that the location of the picketing at the primary employer's premises was 'not necessarily conclusive' of its legality. 341 U.S., at 671 [71 S.Ct., at page 964, 95 L.Ed. 1277]."

In the *Carrier Case*, 376 U.S. at page 497, 84 S.Ct. at page 903, the court referred to the *General Electric Case* and made the following observation:

"The location of the picketing, though important, was not deemed of decisive significance; picketing was not to be protected simply because it occurred at the site of the primary employer's plant."

The legality of separate gate picketing in the *Carrier Case*, at page 497, 84 S.Ct. at page 903, was said to depend

"upon the type of work being done by the employees who used that gate; if the duties of those employees were connected with the normal operations of the employer, picketing directed at them was protected primary activity, but if their work was unrelated to the day-to-day operation of the employer's plant, the picketing was an unfair labor practice."

Although pressures were applied to discourage subcontractors and their employees from crossing picket lines in connection with both the Forest Manor project and the Old Bus Barn project, the court is of the opinion that the picketing at these projects has not been shown to be of such character that there is probable cause to believe it illegal. In

the terms of the *Carrier Case*, quoted above, the picketing was directed at a protected primary activity.

■ Accordingly, the court concludes that the petitioner is not entitled to a temporary injunction under Sec. 8(b)(4) enjoining the picketing at either the Forest Manor or the Old Bus Barn sites. The subcontractors and their employees, who are performing services with Mr. Fenton and with Mr. Peters at these projects, are not so disassociated from those projects as to warrant this court's conclusion that they are being "enmeshed" in somebody else's private labor dispute. The court finds no legal barrier under Sec. 8(b)(4) to foreclose the respondents from making appeals to have such picket lines respected.

■■ The respondents also engaged in picketing and leaf-letting at the retail store owned by the Bergers, who are financially interested in the Forest Manor project. The handbilling at the Berger store would appear to be lawful under the decision in National Labor Relations Board v. Servette, 377 U.S. 46, 47, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). However, there is reasonable cause to believe that the picketing on the part of the respondents at the Berger store is unlawful and, accordingly, the petitioner is entitled to a temporary injunction in regard to that picketing until the matter is passed upon by the Labor Board.

■ The picketing at the Old Bus Barn project began on February 28, 1967. Such picketing would appear to have continued for more than 30 days without a petition being filed pursuant to Sec. 9 of the Labor Act for a Board-conducted election. The court is of the opinion that there is reasonable cause to believe that the respondents have violated Sec. 8(b)(7)(C); accordingly, the petitioner is entitled to a temporary injunction concerning such alleged unfair labor practice.

Petitioner's counsel may present an appropriate order for signature after first exhibiting the same to respondents' counsel.