**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CONSTRUCTION & GENERAL LABORERS' UNION LOCAL 270, INTERNATIONAL HOD CARRIERS' BUILDING AND COMMON LABORERS' UNION OF AMERICA, Respondent.**

No. 21936.

United States Court of Appeals Ninth Circuit.

July 23, 1968.

Garry Green, (argued), Glen M. Bendixsen, Harold B. Shore, Attys., NLRB, Washington, D. C.; Marcel Mallet Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, NLRB, Washington, D. C.; Roy O. Hoffman, Director, NLRB, San Francisco, Cal., for appellant.

Stewart Weinberg, (argued), of Levy DeRoy, Geffner & Van Bourg, San Francisco, Cal., for appellee.

Before BARNES and JERTBERG, Circuit Judges, and CROCKER,* District Judge.

JERTBERG, Circuit Judge.

Before us is a petition of the National Labor Relations Board (hereinafter "Board"), pursuant to Section 10 of the National Labor Relations Act, as amended (29 U.S.C. § 151 et seq.). No issue as to the Board's jurisdiction is presented.

The basic facts involve Howard J. White, Inc. (hereinafter "White"), a general contractor, who was performing the work in the construction industry for the construction of the McCullough Building, a research building at Stanford University. White had contracted the landscaping work on the project to the firm of Hans Eggli (hereinafter "Eggli"). White was signatory to collective bargaining agreements with Construction & General Laborers' Union Local 270, International Hod Carriers' Building and Common Laborers' Union of America (hereinafter "Union"). The employees of Eggli were not members of a Union.

B & C, Inc., (hereinafter "B & C"), were retained by Eggli, pursuant to an oral contract, for the purpose of digging trenches for the irrigation system to be installed by Eggli. The employees of B & C were members of a Union.

John Pierini was the Union's business representative, and Gregory Aguilar was the assistant business representative of the Union.

The Board adopted the findings, conclusions and recommendations of the Examiner, and held that the Union had violated Section 8(b) (4) (i) and (ii) (B) of the Act by inducing and encouraging one Jerry Clement, an employee of B & C, to cease performing services which his employer, B & C, had contracted to perform for Eggli, and by threatening and coercing employers White and B & C, with the object of forcing such employers to cease doing business with Eggli, all for the purpose of forcing Eggli to recognize and bargain with the Union although the Union had not been certified as the representative of Eggli's employees under Section 9 of the Act.

The Board's order requires that the Union cease and desist the unfair labor practices found, and to post the usual notices.

The incidents which gave rise to this case may be summarized as follows:

On April 6, 1965, Aguilar visited the job site and approached one Ramirez, a laborer employed by Eggli, who was digging a ditch. Upon questioning Ramirez, Ramirez informed Aguilar that he was employed by Eggli and was not a member of a Union. After further conversation, Aguilar informed Ramirez that he would return later and speak to Eggli. Later Aguilar spoke to one McCullough, who was White's superintendent on the project. Aguilar asked McCullough if he knew Eggli was non-Union. Mr. McCullough stated that he did. Aguilar in-

---

* Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation.

quired why he permitted non-Union personnel on the job. McCullough replied that Eggli had a contract to do the work and that Eggli would remain on the job. Aguilar told McCullough that unless he arranged to have Eggli leave the job, Aguilar would ask the Union personnel on the job to leave the job. Later McCullough reported to Eggli the substance of his conversation with Aguilar, and asked Eggli how he intended to complete his work in view of the Union's objection to White's having non-Union personnel on the job. Eggli replied he would complete the job in some manner.

On April 7, Aguilar again visited the job site. Aguilar asked McCullough what he and White had decided to do about Eggli. McCullough answered that he did not know. Aguilar informed McCullough that as a Union man, McCullough had a duty to make sure there were no non-Union personnel on the job.

Later, Aguilar approached Clement, who was digging a ditch with a trenching machine. Clement, although normally a working foreman of B & C, which was owned by his father, was the only B & C employee assigned to that project. Aguilar asked Clement for his Union card. Clement replied that he did not have his Union card with him but that he had a work clearance from Local 389, Construction and General Laborers' Union, of which he was a member. Clement had difficulty locating his clearance, and Aguilar accused Clement of working for Eggli and told him that he would have to leave the job. Clement reiterated that his employer, B & C, was a Union firm. Aguilar told Clement that he could get himself caught up in a labor dispute if he didn't get off the job, stating that he would go to White, the general contractor, and see to it that he closed down the job. Later Aguilar discovered that B & C was a Union firm, and advised Clement that it would be best if he left the job. Clement saw Eggli and told him of his conversation with Aguilar, and told Eggli that he couldn't get caught in the middle of a labor dispute. Eggli informed Clement that he didn't want him

to get into any trouble because of the situation. Clement phoned his father, the president of B & C, and explained the situation. The father instructed Clement to get off the job. Clement then left the job and the work which B & C was to perform for Eggli was never completed.

Later, Pierini telephoned Conroy Betts, White's vice-president, and informed him that Hans Eggli was using non-Union labor, adding, having non-Union laborers on the job would create some problems and he might have to pull his men off the job if they continued. Pierini inquired if Betts had spoken to Eggli. Betts replied that he had had several conversations with Eggli and that Eggli had no intention of signing an agreement. Pierini suggested that Betts should call Eggli and try to persuade Eggli to sign up with the Union, and if Eggli refused, Betts was to tell him that if he continued to use non-Union laborers, he might have to get someone else to finish Eggli's work. Pierini informed Betts that he would have to pull his Union men off the job if Eggli continued working on the project with non-Union labor.

Betts phoned Eggli and told him of his conversation with Pierini, and that the project was in danger of being shut down because of him; that Betts did not want work stoppage on the job; and that if Eggli couldn't straighten out the matter, Betts would have to take him off the job. Subsequently Eggli finished his assigned work by working on weekends, although ordinarily he did not do so.

The foregoing summary does not purport to include contradictory testimony furnished by Pierini and Aguilar respecting their versions of the conversations above summarized. In substance Aguilar denied the making to McCullough of any threatening or coercive utterances, and stated that after learning that McCullough knew Eggli was non-Union, Aguilar explained that the use of non-Union subcontractors was a violation of the collective bargaining agreement which White had with the Union; that he requested McCullough to arrange

a meeting between the Union and Eggli to resolve the dispute.

Aguilar likewise denied the making of any threatening or coercive statements to Clement, and, in substance, stated that after confirming Clement's Union affiliation and that of B & C, he made no demands on Clement.

Pierini denied the making of any threatening or coercive utterances to Betts, and, in substance, stated that he told Betts that under the collective bargaining agreement with the Union, White would have to procure Eggli's signature to the agreement.

The Union resists the Board's petition for enforcement on the following grounds:

1) There were no unlawful threats against, or coercion or restraint of White;

2) There were no threats or other unlawful actions against White in violation of Section 8(b) (4);

3) There were no violations of the provisions of Section 8(b) (4) with respect to the subcontractor B & C Company.

■ Section 8(b) (4) (i) and (ii), in relevant part provide that it is an unfair labor practice for a Union or its agents:

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce * * * to engage in, * * * a refusal in the course of his employment to * * * perform any services; or

"(ii) to threaten, coerce, or restrain any person engaged in commerce * * *, where in either case an objective thereof is:

"(B) * * * to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of Section 9; * *."

As stated in N. L. R. B. v. District Council of Painters #48, 340 F.2d 107 (9th Cir. 1965) at pp. 110–111, cert. denied 381 U.S. 914, 85 S.Ct. 1539, 14 L. Ed.2d 435;

"This statutory provision is clearly aimed at curbing the practice commonly known as the secondary boycott whose 'sanctions bear, not upon the employer who alone is a party to the dispute but upon some third party who has no concern in it.' International Bhd. of Elec. Workers, etc. v. N. L. R. B., 181 F.2d 34, 37 (2d Cir. 1950), affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951)."

We construe the Union's contention that there were no unlawful threats, or coercion or restraint of White as a challenge to the sufficiency of the evidence to sustain the Board's findings of fact. In his detailed decision, the Hearing Officer credited the testimony which was denied by the Union representatives.

■■ This Court is required to respect the duty of the trier-of-fact to decide who to believe to reconcile conflicting evidence, and to draw such inferences as the evidence reasonably supports. We will not disturb the resolution of conflicting testimony made by the trier-of-fact. National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, Local 10, et al., 283 F.2d 558 (C.A.9, 1960); Shattuck Denn Mining Corp. v. National Labor Relations Board, 362 F.2d 466, 469–470 (C.A.9, 1966).

■ The Union's contention is based primarily on testimony given by the two business agents of the Union, much of which was discredited by the Board, and ignores the testimony given by other witnesses, which was credited by the Board. We find no merit in the Union's contention, and from our study of the records are satisfied the findings of fact of the Board are supported by substantial evidence on the record considered as a whole.

The Union's contention under 2) above is that the construction site activity of its

representatives was directed against White, the primary employer, because of White's apparent violation of Section 11 of its Collective Bargaining Agreement with the Union, and therefore could not be a violation of secondary boycott conditions contained in Section 8(b) (4) of the Act.

In relevant part, Section 11 provides:

"The terms and conditions of this Agreement insofar as it affects Employer and the Individual Employer shall apply equally to any subcontractor under the control of, or working under contract with such Individual Employer on any work covered by this Agreement, and said subcontractor with respect to such work shall be considered the same as an Individual Employer covered hereby.

If an Individual Employer shall subcontract work herein defined, such subcontract shall state that such subcontractor agrees to be bound by and comply with the terms and provisions of this Agreement."

The inclusion of Section 11 in the Collective Bargaining Agreement is authorized by Section 8(e) of the Act, which in relevant part provides:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible (sic) and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further,* * * *."

The Union argues that since Section 11 is a lawful collective bargaining clause dealing with subcontracting in the construction industry, the Union had a right under the proviso contained in Section 8(e) of the Act to talk directly to White concerning its apparent violation of the collective bargaining agreement, and to take steps against White to correct the violation.

The Union's contention under 3) above is that the activities of Aguilar, in respect to B & C, were not violative of the Act because they were directed to Clement as a manager of B & C, and not as a worker or employee of B & C.

The Union activities found by the Board to have taken place, and summarized earlier in this opinion, clearly constitute, in our view, violations of the provisions of Section 8(b) (4) (i) and (ii) (B) unless it can be said they were protected activities under the Act. We believe that they were not. The proviso contained in Section 8(e) of the Act does not permit the Union to use economic pressure to secure a secondary boycott condemned by the Act. N. L. R. B. v. International Union of Operating Engineers, Local Union No. 12, AFL–CIO, 293 F.2d 319 (C.A.9, 1961); N. L. R. B. v. International Bro. of Elec. Wkrs. Local Union No. 683, AFL–CIO, 359 F. 2d 385 (C.A.6, 1966); Local No. 5, United Ass'n of Journeymen, etc. v. N. L. R. B., 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), cert. denied 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165. See N. L. R. B. v. International Bro. of Teamsters, etc., Local 294, 342 F.2d 18 (C.A.2, 1965).

We find no merit in the contention that the activities of Aguilar, with respect to B & C, were directed to Clement as manager and not as a worker or employee. The record shows, with respect to the construction project, that Eggli's contract with B & C required the latter to supply only one man plus a trenching machine. When questioned by Aguilar, Clement was working alone and operat-

ing the machine himself. Clement was not asked to exercise managerial discretion. He was asked to cease to perform services in the scope of his employment, to which request he acceded. See N. L. R. B. v. District Council of Painters, etc., supra; N. L. R. B. v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964).

The petition for enforcement of the Board's order is granted.