Joseph H. SOLIEN, etc., Petitioner,

v.

UNITED STEELWORKERS OF AMERI-
CA, AFL–CIO–CLC, Respondent.

No. 78–277C(3).

United States District Court,
E. D. Missouri, E. D.

May 8, 1978.

John S. Stevens, N. L. R. B., Region 14,
Alan I. Berger, McMahon, Berger, Brecken-
ridge, Hanna, Linihan & Cody, James E.
Mesnier, St. Louis, Mo., for petitioner.

John H. Goffstein, Gary Hammond, Bart-
ley, Goffstein, Bollato & Lange, St. Louis,
Mo., for respondent.

## MEMORANDUM

NANGLE, District Judge.

This matter is before the Court upon the petition of Joseph H. Solien, Regional Director of Region 14 of the National Labor Relations Board for injunctive relief pursuant to 29 U.S.C. § 160(*l*) pending final disposition of a charge pending before the National Labor Relations Board.

The matter was submitted to the Court upon stipulations of the parties, oral arguments and briefs. Based thereon, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Respondent United Steelworkers of America, AFL–CIO–CLC [hereinafter "Union"] represents for purposes of collective bargaining the employees of Hussmann Refrigerator Company at Hussmann's facility at Bridgeton, Missouri. Said employees have been on strike since May 1, 1977 and have picketed other Hussmann facilities from time to time since that date. Hussmann is a wholly-owned subsidiary of Pet, producing commercial refrigeration equipment, parts for such equipment, display cases, shelving, check-out counters, and other equipment and fixtures.

2. On October 21, 1977, the president of respondent Union held a press conference and stated in part:

. . . I am today announcing the start of a national boycott by our 1.4 million member union of Pet Inc. food products, their retail store outlets and commercial refrigeration equipment.

Pursuant to the boycott, respondent Union placed advertisements in area newspapers

which advised that members of the Union had been on strike at Hussmann's facility in Bridgeton, Missouri; that Hussmann is a part of Pet, Inc., and that the Union requested public support in boycotting "all retail stores owned by Pet, Inc. and . . any product produced by Pet, Inc. and its subsidiaries". The advertisement also listed retail stores and products at which the boycott was directed. From fiscal year 1975 to the present, various Pet subsidiaries have purchased products from Hussmann and its subsidiaries. Numerous Pet subsidiaries, however, have not purchased any products from Hussmann but are still objects of the Union's boycott activities.

3. Handbills were printed which essentially stated the same information. These handbills were distributed in the vicinity of Affiliated Hospital Products, Inc., a plant whose employees are represented for purposes of collective bargaining by respondent Union; on street corners in downtown St. Louis but not at the entrance to any building or establishment; at the end of a football game at Busch Memorial Stadium in the City of St. Louis; in a residential section of O'Fallon, Illinois; on a street in University City, Missouri; and on Manchester Avenue in the City of St. Louis. Petitioner does not contend that the advertisements or handbills were misleading or untruthful.

4. The handbill distributors wore ordinary clothing and carried no signs or other insignia. There was no picketing or patrolling in conjunction with the distribution of handbills. The distribution was peaceful and orderly at all times.

5. On no occasion did the handbilling or advertisements have the effect of inducing any individual employed by any person other than Hussmann to refuse, in the course of his employment, to pick up, deliver, or transport any goods, or not to perform any services.

6. Respondent Union issued boycott instructions which provided in part:

1. *No* boycott material is to be distributed in the vicinity of a retail establish-

ment owned by Pet, Inc. or selling Pet products.

.     .     .     .     .

3. No interference with entrance or exit of any person or workers under any circumstances.

The handbilling activity at all times conformed with these instructions. Neither petitioner nor respondent has received any complaint regarding the conduct of persons engaged in distributing respondent's handbills.

7. On or about November 4, 1977, Pet, Inc. filed charges with the National Labor Relations Board alleging that respondent Union was engaging in unfair labor practices within the meaning of § 8(b)(4) of the National Labor Relations Act.

8. In the middle 1960's Pet transferred in excess of $50 million to Hussmann who used this money to purchase land and construct its facility in Bridgeton, Missouri, and for operating capital. There are no notes or other documents evidencing this original transfer of capital except for accounting entries. No security was given by Hussmann to Pet. No interest has been or will be paid by Hussmann. There is no specific repayment schedule. As of March 31, 1978, the balance due is approximately $16 million.

9. The president of Hussmann was appointed to the position by the Chairman of the Board, President and Chief Executive Officer of Pet, with the approval of the Board of Directors of Pet. Various officers of Hussmann are not in fact operating officers but are employees of Pet, listed as officers of Hussmann for state reporting purposes. The Board of Directors of Hussmann are selected for tax or financial purposes; they are not selected for operational purposes. The members of the Board of Directors perform no service and receive no compensation in their capacity as Directors. This applies to the Board of Directors of other Pet subsidiaries as well.

10. All profits and losses of Hussmann flow to Pet and are ultimately reflected in the financial statements of Pet. The tax

policies and procedures of all Pet subsidiaries and divisions are centrally controlled by Pet. All accounting policies are centrally established by Pet. Pet has established and maintains national accounts, the purpose of which is to enable its subsidiaries and divisions to obtain discounted prices by pooling their purchasing power. Pet centrally administers some benefit programs for salaried employees and executives of all of its various subsidiaries and divisions, but some subsidiaries and divisions maintain and administer additional benefit programs for their salaried employees and executives.

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter and the parties to this proceeding in accordance with 29 U.S.C. § 160(*l*).

The issue before this Court for determination is narrow:

> In proceedings under section 10(*l*) of the Act the district court is not called upon to decide whether, in fact, a violation has occurred. The determination of this question is reserved exclusively for the Board . . . [t]he inquiry of the district court is limited to a determination of whether the Board had reasonable cause to believe the Act was being violated as charged, and if it so concludes, it must grant such relief as it deems just and proper.

> . . . . .

> The propriety of injunctive relief does not depend upon traditional equitable principles, but whether it is necessary to effectuate policy as announced by Congress. It is just and proper when the circumstances of a case create a reasonable apprehension that the statutory remedial purposes will be frustrated in the absence of such relief. *Wilson v. Milk Drivers & Dairy Employees Union, Local 471,* 491 F.2d 200, 203 (8th Cir. 1974).

The charge presently pending before the Board alleges a violation of § 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4) which provides in relevant part:

> It shall be an unfair labor practice for a labor organization or its agents—

> . . . . .

> (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—

> . . . . .

> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer or to cease doing business with any other person . . . . *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

> . . . . .

> . . . *Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution

> . . . .

The facts adduced herein establish that respondent Union engaged in handbilling and advertising only. There was no picketing involved, nor was any of the handbilling accomplished at or near a facility owned by Pet, Inc. or selling Pet products. Due to the relationship between Pet and its subsidiaries, it is obvious that the Union sought a consumer boycott in order to exert the maximum economic pressure possible upon Hussmann to end its dispute with the Union. There is no evidence in this record of

any threat or coercion directed at any individual engaged in commerce or in an industry affecting commerce. Certainly, a consumer does not fall within such a definition. If Pet and its subsidiaries are viewed as the individuals engaged in commerce at whom the threats or coercion are supposedly directed, the record is devoid of any evidence that the Union forced or required any person to cease using or otherwise dealing in Pet products. The locations of the handbill distributions, away from any facility owned by Pet, Inc. or selling Pet products, totally negates any inference that the Union sought to force, coerce or restrain individuals. There is absolutely no evidence from which to conclude or even infer that respondent had as its object the forcing of any employer to cease doing business with Hussmann.

Accordingly, the Court must conclude that upon the record presented herein, the Union's actions do not fall within the prohibitions of the Act. *Cf., National Labor Relations Board v. Servette, Inc.,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). Under such circumstances, the Court is unable to conclude that the Board has reasonable cause to believe that the Act was violated. The petition for the issuance of an injunction will therefore be denied.