**HARRAH'S CLUB, a corporation, Petitioner-Appellant,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee (two cases).**

**Charles PETERSON, Petitioner-Appellant,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee.**

**Nos. 24553, 24607 and 25007.**

United States Court of Appeals, Ninth Circuit.

March 25, 1971.

As Modified on Denial of Rehearing April 26, 1971.

---

Robert V. Magor (argued), of Severson, Werson, Berke & Bull, San Francisco, Cal., for petitioners-appellants.

Howard Schulman, New York City, for intervenor American Guild of Variety Artists.

Ronald Rosenberg, Washington, D. C., for American Federation of Musicians.
Charles Peterson, pro se.

Ian D. Lanoff (argued), Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., N.L.R.B., Washington, D. C., Roy O. Hoffman, Director, N.L.R.B., San Francisco, Cal., for respondent-appellee.

Before HAMLEY, JERTBERG and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This is a consolidated appeal arising from three separate petitions to review and set aside orders of the NLRB that dismissed complaints against three unions charging them with unfair labor practices in violation of 29 U.S.C. § 158 (b) (4). No question of the Board's jurisdiction is raised and we find none. A separate statement of facts will be given where helpful to an understanding of the issues.

### Nos. 24553 and 24607

The American Federation of Musicians, AFL–CIO (hereafter AFM), and the Reno Musicians Protective Association Local 368 had a labor dispute and a strike at Harrah's Club and Sparks Nugget and other hotels in the Reno, Nevada, area between March 1 and April 30, 1968. Harrah's Club and Sparks Nugget operate gambling casinos in the Reno-Lake Tahoe area, and provide other services for their customers, including entertainment.

The strike involved a dispute between the clubs and the house bands which play in certain of the principal entertainment rooms primarily for the purpose of accompanying acts appearing in those rooms.

On April 8, 1968, the American Guild of Variety Artists, AFL–CIO (hereafter AGVA), although not directly concerned in the labor dispute, sent telegrams to certain of its members advising them that AGVA approved the AFM strike and picket line and that according to the AGVA Constitution the member was not

to perform in any of the Reno-Tahoe establishments where AFM was on strike.[1] Sanctions could be levied against members who ignored the approved strike that ranged from fines to suspension from membership, censure, and, ultimately, expulsion.[2]

A charge was filed against AGVA on April 11, 1968, by Charles Peterson, the treasurer of the National Association of Orchestra Leaders, and a complaint was subsequently issued alleging that AGVA's conduct constituted an unfair labor practice in violation of Section 8 (b) (4) (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (ii) (B).

Those sections of the Act provide in pertinent part:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*   \*   \*   \*   \*   \*

"(4)   \*   \*   \*   (ii) to ·threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*   \*   \*   \*   \*   \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any producer, processor, or manufacturer, or to cease doing business with any other person   \*   \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing   \*   \*   \*."

Following a hearing, the Trial Examiner concluded that the union members to whom the telegrams had been sent were "persons engaged in commerce" who had been "coerced" with the object of forcing them to "cease doing business with another person"—Harrah's Club or Sparks Nugget. Satisfied that the Act had been thus violated, the Trial Examiner issued a cease and desist order along with granting other affirmative relief. Exceptions were filed.

---

1.  Gaylord and Holiday, Sid Caesar, and Tennessee Ernie Ford received telegrams from a national officer of AGVA that stated:
    "This is official notice that the AGVA National Board has voted to approve the AFM Strike and to honor the AFM picket lines in Reno and Tahoe. You are therefore advised that, according to AGVA Constitution, you are not to perform in any of the Reno-Tahoe establishments where AFM is on strike."
    Dinah Shore and Tennessee Ernie Ford were also sent telegrams by the San Francisco Branch Manager of AGVA that are not argued to be materially different from the other telegrams. The message to Dinah Shore stated:
    "AGVA National advisors are not to perform at any Reno-Tahoe establish presently strick AFM or they are in violation of AGVA Constitution."
    (Errors in original).
    Tennessee Ernie Ford's message stated:
    "AGVA National advises no acts are to perform at any Reno-Tahoe establishment presently struck by AFM or they are in violation of AGVA Constitution."

2.  AGVA's Bylaws provided:
    "No member of AGVA shall cross an AGVA picket line, or any picket line supported or approved by AGVA. Any member found guilty of violating this Section shall be fined a minimum of $250.00 and/or be suspended for a minimum of thirty (30) days or both." C.T. 44.
    The AGVA Constitution contained a general disciplinary article that states:
    "Section 1. Any member who shall violate or fail to observe any of the requirements of this Constitution or any of the By-laws, Rules, Regulations, Orders or Directives of the Association, or duly authorized committee or representative, or who shall fail to comply with a decision of any branch executive or other hearing committee or arbitration panel in connection with compliance with the provision of any minimum basic agreement, engagement contract, or rule or agreement respecting AGVA franchised agents, or any member who shall in any way be indebted to the Association may, after trial, be either fined, censured, suspended, expelled from membership or placed on the National Unfair List." C.T. 44.

The Board reviewed the Trial Examiner's decision, reversed, and found that the respondent AGVA engaged solely in permissible primary activity with respect to the pressures it exerted on the entertainers to whom it had sent telegrams. Harrah's Club, as an intervenor, and Peterson, appeal from the Board's decision and order dismissing the complaint.

### No. 25007

This appeal arose from the same labor dispute as that involved in Nos. 24553, and 24607, except the conduct complained of was that of the striking union (Local 368) and its national (AFM), and not the supporting union, AGVA. Here, AFM struck several casinos that operated in the Reno-Lake Tahoe area, picketed those clubs, and placed the clubs on the union's national unfair list. Again, telegrams, as well as other notices and letters, were sent to AFM members, and to the employees of one member. Expulsion was the sole remedy which could be levied against any AFM member who performed services for an organization placed on the unfair list.[3] Disciplinary proceedings were in fact instituted against two of the AFM member-employers, Judy Lynn and Ronnie Gaylord, and against the employees of one of the two employer-members. Proceedings were initiated against the first employer-member during the pendency of the strike, Ex. G.C. 22, but the second proceeding did not begin until approximately two months after the end of the strike. Ex.G.C. 24, 25. The end result of the proceedings does not appear in the record before this court.

The charge and complaint in this proceeding, No. 25007, alleged violations of both 8(b) (4) (i) and (ii) (B). Those two sections differ primarily in that (i) is directed at conduct toward employees, while (ii) covers "any person engaged in commerce," and relates to secondary employers. The Trial Examiner in this case felt bound by the Board's decision in the AGVA matter because he concluded that there was no substantial difference between the activity of AGVA, and the activity of AFM, and he dismissed the complaint. The Board summarily affirmed the Trial Examiner. Harrah's Club appeals.

This court has jurisdiction of the proceeding under Section 10(f) of the National Labor Relations Act, 29 U.S.C. 151 et. seq.

The Trial Examiner found that all of the entertainers to whom telegrams were sent were independent contractors and not employees of the particular club in which they were entertaining or had contracted to entertain.[4] Those entertainers were Gaylord & Holiday, Sid Caesar, Dinah Shore and Tennessee Ernie Ford in Nos. 24553 and 24607, and Judy Lynn and Gaylord & Holiday in No. 25007. The Trial Examiner made no determination as to the status of George Liberace in the latter case. The Board did not disagree with the Examiner's judgment on this finding with respect to independent contractor status.

---

3. The AFM Bylaws provided only for expulsion:
   "Whenever any person, persons, organization or establishment is declared to be on the National Unfair or Defaulter List by the Federation, members cannot render services for or with such person, persons, organization, or for, or in, such establishment. If members render services for any person, persons, organization or establishment declared nationally unfair or in default by the Federation, such action shall constitute grounds for such members' expulsion from membership in the Federation and they can only be reinstated under such conditions as may be imposed upon them by the International Executive Board."
   And the AFM threats clearly stated that only this bylaw was sought to be enforced by the charges that were filed. Ex.G.C. 19; G.C. 22, D; G.C. 24; G.C. 26.

4. Had they been employees of the club which was the primary employer with whom the house bands had their labor dispute, then Section 8(b) (4) would not apply.

The controlling statute, Section 158 (b) (4) (ii) (B), distills to the following pertinent language:

"(b) It shall be an unfair labor practice for a labor organization * *.

\* \* \* \* \* \*

"(4) (ii) to threaten, coerce, or restrain any person * * * where * * * an object thereof is—

\* \* \* \* \* \*

"(B) forcing or requiring any person * * * to cease doing business with any other person * * * *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful * * * any primary strike or primary picketing. * * *"

Before considering the proviso, let us examine for a moment the language of the statute preceding the proviso. It can hardly be argued that the telegrams were not threatening and coercive.[5] The Trial Examiners so found in all cases. The Board in its opinion referred to the telegrams as *requesting* that they honor the AFM picket line *or suffer union disciplinary action.*" (Emphasis added). Although the Board thereafter refers to the telegrams as containing "appeals" and "advice" we cannot believe that it would seriously disagree with the Examiner's conclusions. The unions did in fact commence disciplinary proceedings against Judy Lynn, each of the band members employed by her, and Ronnie Gaylord of Gaylord and Holiday for violation of union bylaws. R.T. 42.[6]

The telegrams sent to the performers referred to the vote by AGVA's National Board to "honor the AFM picket lines" and advised that:

"[A]ccording to AGVA constitution, *you are not to perform* in any of the Reno-Tahoe establishments where AFM is on strike." (Emphasis supplied). *See* footnote 1, *supra.*

It was the finding of the Board and is the argument of appellee that this was a reference to primary activity and thus is within the protection of the proviso attached to Section 158(b) (4) (ii) (B), *supra.* We do not read it so.

If the interpretation of the Board is followed, then to all intents and purposes (ii) (B) of the Section is negated by the proviso so long as there is reference in the threatening communication to the primary activity which is taking place. The legislative history of the 1959 amendments adopted as a part of the Labor-Management Reporting and Disclosure Act of 1959 does not support this construction. The general purpose of the 1959 amendments was to close a number of loopholes in the existing law which were thought to permit various forms of secondary boycott and pressure on neutrals.

"The basic justification for banning secondary boycotts is to protect genuinely neutral employers and their employees, not themselves involved in a labor dispute, against economic coercion designed to give a labor union victory in a dispute with some other employer." S.Rep. No. 187, 86th Cong., 1st Sess. (1959), reported in 1959 U.S.Code Cong. & Admin.News at p. 2382.

With respect to neutrality and involvement or lack of it in the basic labor dispute between AFM on behalf of the house bands as employees and Harrah's Club as employer, let us examine the somewhat typical situation of Gaylord and Holiday who received telegrams and who are involved in all three appeals. The Trial Examiner described their operations as follows:

"Gaylord and Holiday constitute a comedy team with singing. With them in their act are two musicians, one a drummer and the other an organist or pianist. These two persons are selected and hired by Gaylord and Holiday and paid by them. The pianist, who is also their conductor, has a contract with Gaylord and Holiday at an annual salary, paid weekly. The

---

5. See footnote 1.

6. Only Gaylord was a union member; Holiday was not.

drummer is paid when the act is performing. Harrah's Club makes no deductions from the weekly compensation paid to Gaylord and Holiday except the 10 percent that goes to their agent. Gaylord and Holiday, however, make social security and other deductions from the wages paid the drummer and the pianist, and I find that they are employees of Gaylord and Holiday. The pianist and drummer did not accompany Gaylord and Holiday during the period of the AFM strike.

"Harrah's Club determines when the act shall perform and how long it shall perform, but Gaylord and Holiday determine the contents of the act except that they must comply with Harrah's policy on risque material.

"The main lounges where Gaylord and Holiday appeared are not Harrah's principal show rooms at Reno or Tahoe but are smaller rooms for entertainment seating approximately 250 persons each. Gaylord and Holiday do a self-contained act and did not utilize a house band or chorus line in their performances at Harrah's."

Nos. 24553 & 24607, C. T. 39–40.

It thus appears that Gaylord and Holiday have no reason to be involved in the dispute which is pending between the club and the house band. They are neutrals and not combatants.[7] Their engagement at Lake Tahoe was scheduled for four weeks and evidenced by a written contract. Ex.G.C. 2.

One of the loopholes in the prohibition of secondary boycotts was a line of cases holding that Section 8(b) (4) (A) (predecessor section to the one here involved) did not apply to threats by a labor organization to an employer.[8]

In National Labor Relations Board v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), the Court considered the amendments of 1959 and particularly the significance of and reason for sub-sections (i) and (ii) pointing out that Congress intended the secondary boycott prohibition to reach secondary "employers" as well as employees. The Court said:

"Moreover, the division of § 8(d) (4) into sub-sections (i) and (ii) by the 1959 amendments has direct relevance to the issue presented by this case. *It had been held that § 8(b) (4) (A) did not reach threats of labor trouble made to the secondary employer himself.* Congress decided that such conduct should be made unlawful, but only when it amounted to conduct which 'threaten[s], coerce[s] or restrain[s] any person', hence the addition of subsection (ii). The careful creation of separate standards differentiating the treatment of appeals to the employees of the secondary employer not to perform their employment services, from appeals for other ends which are attended by threats, coercion or restraint, argues conclusively against the interpretation of subsection (i) as reaching the Local's appeals to the supermarket managers in this case. If subsection (i), in addition to prohibiting inducement of employees to withhold employment services, also reaches an appeal that the managers exercise their delegated authority by making a business judgment to cease dealing with the primary employer, subsection (ii) would be almost superfluous. Harmony between (i) and (ii) is best achieved by construing subsection (i) to prohibit inducement of the managers to withhold their services from their employ-

---

**7.** We hasten to note that there are differences between the Gaylord and Holiday relationship with Harrah's and that relationship between Dinah Shore, Tennessee Ernie Ford, Judy Lynn and Sid Caesar. We do not find the differences of sufficient significance to alter the legal result.

**8.** See N.L.R.B. v. International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO, Local 366, 272 F.2d 817, 819 (10th Cir. 1959) ; Rabouin v. N.L. R.B., 195 F.2d 906, 911–912 (2d Cir. 1952).

er, and subsection (ii) to condemn an attempt to induce the exercise of discretion only if the inducement would 'threaten, coerce, or restrain' that exercise." 377 U.S. at 53–54, 84 S.Ct. at 1103–1104. (Footnotes omitted).

The footnote at the end of the above quotation also makes clear that threats directed to an employer are within the unfair labor practice provisions.

"The Conference Committee in adopting subsection (ii) understood that the subsection would reach only threats, restraints or coercion of the secondary employer and not a mere request to him for voluntary cooperation. Senator Dirksen, one of the conferees, stated that the new amendment 'makes it an unfair labor practice for a union to try to coerce or threaten as employer directly *(but not to persuade or ask him)* in order— * * To get him to stop doing business with another firm or handling its goods.'" 105 Cong.Rec. 19849, II Leg. Hist. 1823. (Italics supplied.)" 377 U.S. at 54 n. 12, 84 S.Ct. at 1104.

*See also* N.L.R.B. v. Local 825, Int'l Union of Operating Engineers, A.F.L.–C.I.O., 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398, 1971; National Labor Relations Board v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U. S. 58, 68, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1946); N.L.R.B. v. Construction & General Laborer's Union Local 270, 398 F.2d 86 (9th Cir. 1968); N.L.R.B. v. District Council of Painters #48, 340 F.2d 107 (9th Cir.) cert. denied, 381 U.S. 914, 85 S.Ct. 1539, 14 L.Ed.2d 435 (1965).

We are therefore persuaded that since the telegrams were clearly intended to and did threaten, coerce and restrain an employer where "an object" thereof was to force or require that employer to cease doing business with Harrahs, the action did constitute an unfair labor practice, unless it was saved by the proviso of subsection (B), *supra.*

"[T]hat nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. * * *"

However no action has been taken in the proceedings before the Board by Harrah's Club or AGVA, the primary respondent, as disclosed by the record here, to declare the primary strike or the primary picketing unlawful. Neither do the charges in any of the three cases before us attack the primary strike or the primary picketing. The complaint charges that on a certain date, respondent AGVA by telegram threatened Tennessee Ernie Ford with disciplinary action by respondent if he performed services for Harrah's Club. ¶ VIII, C.T. 9.

The next paragraph charges that an object of that action was to force or require Ford to cease doing business with Harrah's Club. C.T. 10. Finally, it is alleged that such action constitutes an unfair labor practice within the meaning of Section 8(b) (4) (ii) (B) of the Act.[9] No charges were filed attacking the primary strike or the primary picketing.

The answer of respondent, AGVA, asserts that all of the "name" entertainers are employees of Harrah's, and therefore the coercion section does not apply. This issue has been found against them. In addition the answer asserts that the acts of AGVA as alleged in paragraph VIII of the complaint "were carried out in conjunction with a primary strike and primary picketing." [10]

The cases have pointed out the guidelines to be applied to activity in connection with a primary strike and primary picketing as being:

"The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved 'primary picketing' from the sec-

---

9. Similar charges were made with regard to each entertainer.

10. *See* Nat'l Woodwork Mfr's Ass'n v. N.L.R.B., 386 U.S. 612, 632 n. 20, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

ondary ban. Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt." United Steelworkers of America, A.F.L.–C.I.O. v. National Labor Relations Board, 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964).

This court has held that under the circumstances of the case being decided, "we believe a union must exercise its right to picket with restraint consistent with the right of neutral employers to remain uninvolved in the dispute." Retail Fruit & Vegetable Clerks Union, Local 1017, etc., v. N.L.R.B., 249 F.2d 591, 599 (9th Cir. 1957). This is in accord with the view of the Supreme Court even before the 1959 amendments, in saying with respect to the litigants in National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951):

> "[A]s applied to this case we find conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."

The Board takes the view that the conduct of the respondent "in *advising* its members to honor the AFM picket lines was not substantially different from that of the AFM itself in conducting the picketing at the situs of the disputes, namely at the clubs themselves." How much difference in practical effect between the sending of the telegrams and the doing of substantially the same thing at the picket lines is, of course, debatable. The answer is that Congress in 1959 by law made it an unfair labor practice to threaten, coerce or restrain a secondary employer. The entertainers here were secondary employers and they were threatened, coerced and restrained. Whether the respondent could have done the same thing or not at the picket line itself in reliance upon the proviso is beyond the issues of this case. We cannot agree with the Board in its disregard of the plain language of the statute.

Nor does the threat of union disciplinary action rather than the threat of a picket line around the homes or offices of the entertainers, make respondents actions any less a violation of statute. Glaziers Local 1184, (Tennessee Glass Co.,) 164 N.L.R.B. 116 (1967). In *Tennessee Glass Company*, the secondary employers were also members of the union which was engaged in the primary labor dispute. They were independent contractors operating proprietorships and a partnership engaged in the installation of glass. They purchased their supplies from Tennessee, the primary employer, which had the dispute with Local 1184. They were sent copies of letters which called attention to the dispute and to the strike and continued:

> "[W]e are instructing our members who are in any way, form or fashion doing business with Tennessee Glass Co. or any of their Associates to stop immediately. We are saying that * * Local Union No. 1184 will bring charges against any member found guilty of having any connection with this situation with Tennessee Glass Co. or their Associates." 164 N.L.R.B. at 117.

The Board agreed with the Trial Examiner's finding of an unfair labor practice and a violation of Section 8(b) (4) (ii) (B) of the Act. There was no contention in that case as there is here that the violation was negated by the proviso. The union urged as a defense, among others, that the contractors were not coerced by the letter. Said the Examiner:

> "The issue is not the fact of coercion but whether the letter reasonably tended to coerce the contractors. A reading of the letter demonstrates conclusively that it was intended to co-

erce the independent contractors into a cessation of business with Tennessee by threatening the contractors herein with disciplinary action." 164 N.L.R. B. at 118.

*See also* Laundry, Dry Cleaning, Industrial, Linen Supply and Dust Control Driver's Local 209, (East Bay Counties Dry Cleaners Association), 167 N.L.R.B. 45 (1967).[11]

The Board appears to rely heavily upon the *General Electric* and *Carrier* decisions.[12]

In each of those cases the problem concerned picketing at the premises of the employer with whom the primary labor dispute existed. The question was whether a separate gate at the premises could be so reserved and so marked for the use of employees of secondary employers that it could be free from the primary picketing. In neither case was a telegram or letter sent to the secondary employer which involved threats, coercion and restraint directed to a disruption of his contract or his business relationship with the primary employer. We do not find those cases controlling in this fact situation.

Likewise, in our view of the case it is not necessary to examine the highly debatable question whether the entertainment of the star performers was "inextricably involved with and necessary to the normal operations of the casinos," as found by the Board. The problem of sorting out the normal operations of a business and making a determination of whether employees of secondary employers are a necessary part of those normal operations, becomes vital in cases like *Carrier* and *General Electric* where there is a separate gate controversy. There is none here. The complaint here is addressed to the lawfulness of coercion of employers directly by sending threatening telegrams to them. No question is raised about the mechanics of the primary picketing.

The final question raised is that of the application of the "ally" doctrine. That doctrine is to the effect that if the struck primary employer farms-out work to a business ally which the strikers would ordinarily perform, the employer to whom the work has been farmed-out cannot be considered a secondary employer but stands in the same position as the primary employer as respects application by the union of economic pressures. N.L.R.B. v. Business Machine & Office Appliance Mechanics Conference Board, Local 459, (Royal Typewriter Co.), 228 F.2d 553 (2d Cir. 1955). The Trial Examiner found that both Tennessee Ernie Ford and Dinah Shore were in the position of allies and thus there was no unfair labor practice as to them. The Board did not reach the question. We have some difficulty in following the rationale of the Trial Examiner to the effect that Ford was an ally and that Miss Shore would have been an ally had she performed. We defer, however, to the expertise which we hope the Trial Examiner has in such a matter.

11. The possible conflict between Section 8(b) (1) (A) and the proviso appended thereto (stating that nothing in that paragraph shall impair the right of a labor organization to prescribe its own rules with respect to acquisition and retention of membership) and Section 8(b) (4) (ii) (B) in the light of the facts of this case where the secondary employers were also union members, has not been raised either by the pleadings, or by the Board. It was discussed only by intervenor AG VA and was mentioned in passing by the Trial Examiner. We do not consider it an issue here since 8(b) (1) (A) refers to employees while our concern is with secondary employers.

It is interesting to note that in East Bay Counties Dry Cleaners Association, 167 N.L.R.B. 45, 51 (1967), the respondent union made the same contention that is made here, i. e. that the conduct in which the union engaged does not fall within the purview of Section 8(b) (4) because it was primary in nature.

12. Local 761, International Union of Electrical, Radio and Machine Workers, A.F.L.–C.I.O. v. National Labor Relations Board (General Electric Co.), 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); United Steelworkers of America, A.F.L.–C.I.O. v. National Labor Relations Board (Carrier Corp.), 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964).

Both the Trial Examiner and the Board are in substantial agreement as to the material facts. We have reviewed the whole record including the report of the Examiner and the decision of the Board. We find that there is substantial evidence, indeed overwhelming evidence, to support the findings of fact to the effect that the entertainers to whom telegrams were sent were independent contractors; that the telegrams sent by respondent threatened, coerced and restrained the independent contractors who received them; and that they were sent for the unlawful object of forcing or requiring the recipients to cease doing business with Harrah's Club or Sparks Nugget. It appears clear that the Board in basing its decision upon the legal conclusion that respondent was engaged in permissible primary activity is in error. All three cases present substantially the same fact situations and the same legal problems. In all three there was a finding by the Trial Examiner that the name entertainers were independent contractors and not employees and thus were "employers"; in all, he found that there had been threats and coercion an object of which was to cause the secondary respondents to cease doing business with the primary employer. The Board ruled as a matter of law that this was "primary activity." There being no substantial evidence to support that decision when viewed in the light of the record in its entirety, we grant the petition for review, decline to enforce the orders and vacate the decision of the Board in each of the three cases. In each case we find that the actions of the particular union complained about constituted unfair labor practices in violation of Section 8 (b) (4) (ii) (B) of the Act, 29 U.S.C. § 158(b) (4) (ii) (B), and in No. 25007 a violation of 8(b) (4) (i) (B) of the Act, 29 U.S.C. § 158(b) (4) (i) (B) insofar as the unlawful activities applied to employees of one of the secondary employers. All three cases are remanded to the Board for the purpose of enabling it to enter an order in each in accordance with the tenor of this decision.