**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 571, AFL–CIO, Respondent.**

**No. 79–1650.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1980.

Decided July 3, 1980.

---

W. Christian Schumann, Atty., N.L.R.B., Washington, D.C., argued, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Ruth E. Peters, Atty., Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief, for petitioner.

David D. Weinberg, Weinberg & Weinberg, Omaha, Neb., for respondent.

Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

The National Labor Relations Board petitions this court under section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), for enforcement of an order issued by the Board on April 20, 1979 against the International Union of Operating Engineers, Local 571, AFL–CIO (Local 571 or Union), finding the Union committed an unfair labor practice and ordering the Union to cease and desist. The respondent Local 571 denies the commission of an unfair labor practice and further argues that the Board's order is overbroad. We enforce the Board's order in full.

J.E.D. Construction Company (Company) is a masonry contractor in the building and construction industry in Lincoln, Nebraska. Although the Company's employees are represented by the Laborers International Union of North America, Local 1140, AFL–CIO (Laborers Local 1140), the Company also occasionally assigns some of its construction work involving the operation of forklifts to members of Local 571. The Company, however, has never regarded Local 571 as its employees' bargaining representative and the Board has never certified Local 571 as the collective bargaining representative of the Company's employees.

As a result of the need for infrequent assignments to Local 571 members, the Company in 1969 entered into two "participation agreements" with Local 571. Under these agreements, the Company was required to make payments to the Union's pension and welfare fund for each hour worked by employees represented by Local 571. Later and in August, 1975 the Company agreed to pay a permit fee to Local 571 on a certain construction project so that the Company could assign operation of the

forklifts to members of Laborers Local 1140. But in the spring of 1976 the Company notified Local 571 that it would no longer pay the permit fee and the Company signed a collective bargaining agreement with Laborers Local 1140.

Thereafter, Local 571 filed notices with the Impartial Jurisdictional Disputes Board (IJDB) of a jurisdictional work dispute between it and Laborers Local 1140. Local 571 requested information, including payroll and overtime records, from the Company "as an aid in collective bargaining and for the purpose of proper representation of employees in the bargaining unit." The Company, however, denied the request noting that it had never signed a collective bargaining agreement with Local 571 and had cancelled the two participation agreements.

In July, 1977 Local 571 filed another jurisdictional work assignment complaint with the IJDB. Upon notification of the complaint, the Company reiterated that it had never entered into a collective bargaining agreement with Local 571 and said the Company would not be governed by a decision of the IJDB.

In August, 1977 Local 571 sent a letter to the Company noting that while it did not claim to represent the Company's employees and had no intent to achieve representational status, it found objectionable the Company's wage scale for employees who operated forklifts. The letter stated that the Company was paying wages and benefits below the area standards established by

them and if the Company was unwilling to pay the cost equivalent of wages and benefits set out in the letter, Local 571 would publicize that the Company's wage scale was below area standards.

Late in the fall of 1977 the Company began work on a job site at Southeast Community College in Lincoln. The Company assigned the forklifting as well as bricklaying and building of scaffolding to employees represented by Laborers Local 1140. Because of inclement weather, forklifting was infrequent during the winter months. But beginning on March 10, 1978 forklifts were operated more frequently. On March 21, 1978 the Union began picketing the work site allegedly to protest the fact that the Company was paying substandard wages. The picket signs read:

INFORMATIONAL ONLY J.E.D. CONSTRUCTION DOES NOT PAY UNION WAGES OPERATING ENGINEERS LOCAL 571 THIS DISPUTE IS WITH THE ABOVE–NAMED EMPLOYER ONLY

The next day the Company filed an unfair labor practice charge with the NLRB pursuant to section 10(k) of the Act, 29 U.S.C. § 160(k), claiming that the Union had committed an unfair labor practice in violation of § 8(b)(4)(i)(ii)(D), 29 U.S.C. § 158(b)(4)(i)(ii)(D).[1]

Following submission of the complaint, the Regional Director of the NLRB sought a preliminary injunction to enjoin the pick-

1. Section 8(b)(4)(i)(ii)(D) provides that it is an unfair labor practice for a union "(i) to engage in, or to induce or encourage . . ., a strike or a refusal . . . to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—

    (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work . . . .."

Section 10(k) provides:
(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

eting. Concluding that the NLRB had reasonable cause to believe the picketing was an unfair labor practice, the United States District Court for the District of Nebraska issued a preliminary injunction. The case was appealed to this court styled *Hendrix v. International Union of Operating Engineers, Local 571*, 592 F.2d 437 (8th Cir. 1979), and we affirmed the district court decision.

On April 18, 1978 the NLRB held the 10(k) hearing to determine which union was entitled to the forklift assignment and whether there had been a violation of § 8(b)(4)(i)(ii)(D). The Board found that there existed a jurisdictional dispute and resolved the dispute by awarding the work to employees represented by Laborers Local 1140. When Local 571 refused to abide by the Board's determination, the Regional Director of the NLRB issued a complaint against the Union alleging a violation of § 8(b)(4)(i)(ii)(D). Thereafter, an Administrative Law Judge granted the general counsel's motion for summary judgment on the ground that Local 571 was attempting to relitigate matters already decided in the previous 10(k) proceeding. The Board ordered the Union to cease and desist from its unfair labor practice. The Board now petitions this court for enforcement of this order.

■ In response to the petition, Local 571 first claims that the Board improperly found a violation of § 8(b)(4)(i)(ii)(D). Local 571 argues that its sole interest in picketing the construction site was to protest the Company's disregard for established area standards and submits that such area standards picketing does not violate the Act.

We are unpersuaded that Local 571 was engaged in area standards picketing. We first note that we have found no evidence showing a bona fide attempt by Local 571 to determine if the Company was paying less than the area standards wage before beginning the picketing of the Company in March, 1978. Although the Union claims that in July, 1977 its Business Representative Albert Tritsch met with Norman Sunderman, the Business Representative of Laborers Local 1140, and allegedly discovered that the Company's wage rate was $7.16 per hour, this claim seems highly suspect. As the Board noted:

.   .   . Sunderman did not corroborate the July 1977 conversation with Tritsch .   .   .. In addition, the record reveals that in late July 1977, forklift operators were being paid $6.61 per hour, although that rate was increased to $7.16 per hour retroactive to August 1, 1977, by the collective-bargaining agreement which came into effect on April 1, 1978. Thus, it is highly unlikely that Sunderman would have told Tritsch in July 1977 that forklift operators were being paid $7.16 per hour .   .   .. Tritsch also admitted that he did not look at the latest collective-bargaining agreement between Laborers Local 1140 and the Employer which went into effect on April 1, 1978. Finally, we note that between July 1977 and March 21, 1978, the Respondent made no further effort to determine whether the Employer was paying less than area standards .   .   ..

99 LRRM 1117, 1120.

Furthermore, the picket signs themselves do not seem to support Local 571's assertion that it was engaged in lawful area standards picketing. Although the Union concedes that the Company was paying the wage rate established by the bargaining agreement between the Company and Laborers Local 1140, the picket signs read "J.E.D. Construction does not pay *union wages*." (Emphasis added.)

Finally, events during and prior to the summer of 1977 also seem to refute the Union's argument that it was engaged in area standards picketing. As previously noted, Local 571, prior to picketing the Southeast Community College work site, had actively sought the Company's forklift work. In May, 1976 the Union filed a notice of a jurisdictional work dispute claiming the right of its members to certain forklift work. In July, 1977 Local 571 again filed a similar jurisdictional claim with the IJDB over the right to the forklift

work at another site. Certainly these actions would tend to reflect that Local 571's picketing the following spring may have had a jurisdictional objective.

The Union, however, attempts to refute this implication by arguing that shortly after filing the jurisdictional work dispute notices in July, 1977 it decided not to pursue the claims to the work in dispute and sent a letter dated August 19, 1977 disclaiming a representational interest as to the Company's employees.

We find Local 571's claim of a sudden change in motivation highly doubtful. We note that the letter of August 19 did not disclaim the work in dispute, but only disclaimed a representational intent as to the Company's employees. As the Board observed:

> . . . [T]he August 19 letter was sent at a time when the IJDB was still considering the jurisdictional work dispute, and had in fact set a hearing date of August 25, 1977, to consider the dispute. Thus, the Respondent could not have been disclaiming the work in dispute in its August 19 letter when at the same time it was prepared to go to an IJDB hearing regarding the dispute.

99 LRRM 1117, 1121.

Local 571 next claims that the Board erred in substantially basing its finding of an unfair labor practice on events during and prior to the summer of 1977. Local 571 argues that under section 10(b) of the Act, 29 U.S.C. § 160(b),[2] the Board is barred from considering evidence of events occurring six months prior to March 22, 1978, the date of the filing of the unfair labor practice charge. Moreover, Local 571 contends that events during the six month limitations period could not justify a finding that the picketing had a jurisdictional objective. We find this argument unconvincing.

In determining the application of § 10(b) to evidentiary matters, the Supreme Court developed a classification system which distinguishes some of the various types of situations which may arise under the provision. See Local Lodge No. 1424, International Ass'n of Machinists (Bryan Manufacturing), AFL–CIO v. NLRB, 362 U.S. 411, 416–17, 421–22, 80 S.Ct. 822, 826–827, 829–830, 4 L.Ed.2d 832 (1960). And the Bryan Court indicated that the determination of whether events prior to the six months limitations period could be considered should be made on the basis of the underlying policies of § 10(b) described as follows:

> . . . to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused,' H.R.Rep.No. 245, 80th Cong., 1st Sess., p. 40, and of course to stabilize existing bargaining relationships. (Footnotes omitted.)

Id. at 419, 80 S.Ct. at 828.

Considering the present factual situation in light of these policies, we first note that the events in issue did not take place at a time so remote that there is a risk that the evidence has lost its probative value. Most of the events in issue occurred within a few months prior to the allowable six month limitations period. Moreover, we observe that there was no intervening change in circumstances in this short period of time which might undermine the Board's inference that the "objective manifested by this antecedent conduct continued unchanged." Sheet Metal Workers' International Ass'n v. NLRB, 293 F.2d 141, 147 (D.C.Cir.1961).

The basic findings in this case centered around the picketing of March 21, 1978 and the object sought to be achieved by that picketing. While in making its determination, the Board did look at some activity beyond the six month period, that activity served primarily to shed light upon the purposes and intent of those acting on behalf of the Union at the time the picketing was commenced. In such circumstances, we believe that the Board's consideration of evi-

---

2. Section 10(b) in part provides:

. . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ..

dence of events prior to the allowable six month period was not erroneous.

 Local 571's last assignment of error is that the Board's remedy is overbroad because it affects the Union's activities with other employers in Lincoln, Nebraska with whom it may have no jurisdictional objective.

This argument merits little discussion. The order proscribes only Union activities involving conduct with "an object of forcing or requiring the Employer to assign the dispute work . . . to employees whom it represents rather than to employees represented by Laborers." The order clearly is proper. *Bakery Wagon Drivers & Salesmen, Local Union No. 484 v. NLRB,* 321 F.2d 353, 358 (D.C.Cir.1963).

Let judgment be entered enforcing the Board's order in full.

Bright, Circuit Judge, dissented and filed opinion.