**ALLENTOWN RACQUETBALL & HEALTH CLUB, INC.**

v.

**BUILDING AND CONSTRUCTION TRADES COUNCIL OF LEHIGH AND NORTHAMPTON COUNTIES, et al.**

Civ. A. No. 80–1077.

United States District Court, E. D. Pennsylvania.

Sept. 30, 1981.

Herbert L. Levy, Allentown, Pa., for plaintiff.

Stephen C. Richman, Philadelphia, Pa., Harry P. Creveling, Allentown, Pa., David Freeman, Philadelphia, Pa., for defendants.

## MEMORANDUM

HUYETT, District Judge.

This is a labor dispute between an owner of premises under construction at the time relevant to this case and labor organizations and one individual labor official. The plaintiff-owner alleges that the defendants violated § 8(b)(4) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4), by engaging in several activities relating to the construction of plaintiff's racquetball club. In addition, plaintiff asserts pendent state law claims. For reasons which follow, summary judgment will be granted for the defendants on some aspects of plaintiff's case. On others, there remain genuine issues of material fact and so summary judgment will be denied.

The plaintiff is Allentown Racquetball and Health Club (ARC). It commenced this action under § 303 of the Labor Management Relations Act, 1947 (LMRA), 29 U.S.C. § 187, alleging that the defendants violated the secondary boycott provisions of § 8(b)(4)(i)(B) [1] by (1) engaging in picketing in violation of that act; (2) coercing, by threats of fines, members of the defendant locals from performing services for Duggan & Marcon, Inc. (D&M), a neutral employer which had a contract with ARC and with which the defendants had no dispute; and (3) by placing advertisements in local newspapers which failed to identify the primary employers with whom the defendants had disputes.

The defendant Building and Construction Trades Council of Lehigh and Northampton Counties (BCTC) is a voluntary association of local unions such as carpenters, laborers, ironworkers, plumbers, and other practitioners of building trades. The committee within the BCTC with the authority to order strikes or picketing was the committee comprised of the Business Agents of affiliated local unions. Two locals affiliated with the BCTC are also defendants here: Local 401 of the Wood, Wire and Metal Lathers International Union of Allentown and Vicinity (Local 401) and Laborers District Council of Eastern Pennsylvania, Local

---

1. Section 8(b)(4)(B) provides:

   (b) It shall be an unfair labor practice for a labor organization or its agents—

   .    .    .    .    .

   (4)(i) to engage in, or to induce or encourage any [employee] to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

   .    .    .    .    .

   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. 29 U.S.C. § 158(b)(4)(B).

1174 of the AFL–CIO (Local 1174). The only individual defendant, James W. Sweeney, was the president of BCTC during most of the relevant time. He has been and is currently a member of Local 401. He was also a member of Local 1174. All of the defendants have moved for summary judgment.

ARC selected Biehn Construction, Inc. (Biehn), a non-union general contractor, as the general contractor for the construction of the ARC complex at 601 Union Street, Allentown, Pennsylvania. Biehn in turn entered into subcontracts with both union and nonunion subcontractors. Semmel Excavating, Inc. (Semmel) and Robert Schilling, Inc. (Schilling) were two nonunion subcontractors who performed work at the ARC site. While Semmel was at work on the ARC project, pickets from BCTC appeared carrying signs which read: "NOTICE SEMMEL EXCAVATING, INC. IS DESTROYING BUILDING INDUSTRY STANDARDS WE PROTEST AGAINST NOT OBSERVING WAGES AND STANDARDS BUILDING AND CONSTRUCTION TRADES COUNCIL OF LEHIGH AND NORTHAMPTON COUNTIES AND VICINITY." When Semmel finished its work, the pickets changed the name on their signs from Semmel to Robert Schilling, Inc. which was then working on the site. When Schilling left the site, the pickets changed the reference from Schilling to Biehn, the general contractor. The pickets were present at the construction site from about May 31, 1979 to about January 10, 1980.

To provide the lathing and plastering work needed on the interior of the racquetball club, Biehn entered into a subcontract with Duggan & Marcon, Inc. (D&M), a union contractor. On August 16, 1979 when D&M was to have begun work, Charles Marcon informed ARC that all of his employees who were union members of Local 401 refused to cross the BCTC picket lines. On August 20, 1979, ARC established a "neutral" gate for D&M employees only. D&M employees still refused to work. The record is unclear on whether the pickets respected the neutral gate. D&M filed an unfair labor practice charge against BCTC on August 22, 1979. This charge was settled without BCTC conceding liability but with an agreement that members of Local 401 would not be fined for performing work on the ARC site. Prior to approval of the settlement by the NLRB, employees of D&M who were members of Local 1174 refused to appear for work. Local 1174 members were laborers whose presence was required before members of Local 401 could do their work. As a result, D&M was not able to carry out its contract with Biehn. Biehn had to secure a different, nonunion subcontractor to do the lathing work. The plaintiff alleges that this caused a delay in the opening of the club which injured the plaintiff.

On October 28, 1979, after D&M had surrendered its subcontract with Biehn, BCTC ran the following advertisement in the Allentown Sunday Call-Chronicle:

TO THE GENERAL PUBLIC:

We would like to advise you that the Allentown Racquetball Club in Allentown was built in part by workmen who received wages and enjoyed working conditions which are below those prevailing in the Lehigh Valley area. Those workers who constructed the Allentown Racquetball Club did not receive the rates of pay or enjoy the working conditions customarily received by building tradesmen in the Lehigh Valley area. We ask the support of the general public in our efforts to maintain the high standards and decent wages and working conditions which we have established in this area. When the owners of the Allentown Racquetball Club construct a building and seek to have it done by workers who receive less than the prevailing rates, our jobs and our working conditions are adversely affected.

We ask the support of the general public in our efforts to have all workers engaged in the building and construction industry receive the wage rates and enjoy the working conditions which we have established. We ask your aid and support.

BUILDING AND CONSTRUCTION TRADES COUNCIL OF LEHIGH–NORTHAMPTON COUNTIES

Andrew Cuvo, Pres., James W. Sweeney, Vice Pres.

A second advertisement, identical to the first, ran in the same Allentown paper on December 16, 1979. ARC began partial operation on December 17, 1979 and full operation on January 20, 1980.

■ Section 303 gives injured parties a claim for damages against a union where the party has been injured by union activity which amounts to an unfair labor practice under § 8(b)(4) of the NLRA. Section 8(b)(4) makes certain conduct (relating generally to secondary boycotts and jurisdictional disputes), when engaged in by labor organizations, an unfair labor practice. The NLRA provides a remedy for unfair labor practices by empowering the NLRB to prevent the union from engaging in the practice. *See* 29 U.S.C. § 160. Section 303 also provides a remedy for a violation of § 8(b)(4) by authorizing a suit for damages cognizable in either state or federal court. 29 U.S.C. § 187. The purpose of § 303 is to keep labor disputes confined to the parties between whom negotiations for settlement should properly take place. *See generally* Annot., 7 ALR Fed. 767 (1971). Section 8(b)(4)(B) reflects a congressional judgment that secondary boycotts [2] are not legitimate tools of organized labor because they unfairly enmesh in a labor dispute persons who are "neutral," that is, uninvolved in the union's grievance against the primary employer. R. Gorman, *Labor Law* 241 (1976).

*Plaintiff's Claims Against James W. Sweeney*

■ The plaintiff has named Sweeney, a former union official, as a defendant in plaintiff's claims based upon § 303 and in addition, in plaintiff's claims based upon state tort law. Sweeney moves for summa-

ry judgment correctly noting that individual union members are not proper defendants in a section 303(b) suit against the union. *See Kerry Coal Co. v. UMW*, 637 F.2d 957, 965 (3d Cir. Jan. 8, 1981), *petition for cert. filed*, 49 U.S.L.W. 3883 (U.S. No. 80–1891 May 8, 1981); Annot., 7 ALR Fed. at 818.

In *Kerry Coal*, the Third Circuit recognized that a plaintiff cannot recover under § 303 against individual defendants. Nevertheless, the court held that this did not deprive the court of subject matter jurisdiction over the pendent state law claims because the plaintiff had alleged other federal claims against the individual defendants in addition to the § 303 claims. The plaintiff pleaded claims for relief from the individual defendants under 42 U.S.C. § 1983 and under federal common law. The court stated that these were nonfrivolous federal claims, sufficient to confer subject matter jurisdiction over the pendent state law claims. 637 F.2d at 965.

■ Unlike *Kerry Coal*, in this case the plaintiff has alleged only one federal claim against this individual defendant: its claim based upon § 303. Since a § 303 action cannot be brought against an individual union member, the defendant is entitled to have the plaintiff's § 303 claims dismissed. Without the § 303 claims this court has no independent basis of subject matter jurisdiction over the plaintiff's state law claims against the defendant. Therefore, these claims will be dismissed as well.

*Plaintiff's Claims Based Upon Newspaper Advertisements*

The plaintiff contends that the newspaper ads run by the defendant BCTC violated § 8(b)(4)(B) because the ads did not identify the primary employers. Instead, they named only the neutral third-party ARC. According to the plaintiff, this choice of language reveals the defendants' unlawful objective to induce persons to boy-

---

**2.** A secondary boycott is the application of economic pressure upon a person with whom the union has no dispute regarding its own terms of employment (neutral or secondary employ-

er) in order to induce that person to cease doing business with another employer with whom the union does have a dispute (primary employer). R. Gorman, *Labor Law* 240 (1976).

cott ARC, thereby inducing ARC to cease doing business with the primary employers. In addition, the plaintiff contends that the ads were defamatory.

■ The defendants contend that these advertisements fall squarely within the saving provision of § 8(b)(4), called the publicity proviso. It provides:

> For the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, . . . .

29 U.S.C. 158(b)(4). The proviso was enacted to protect appeals to consumers which are in the nature of "information or publicity about the facts of a labor dispute which the consumer will presumably weigh in determining whether or not to cut off all or part of his patronage of the neutral company." R. Gorman, *supra*, at 261. Although the proviso literally protects the dissemination of information about union's dispute with a primary employer who is the manufacturer of goods distributed by a neutral party, it has been interpreted to apply where the primary employer merely distributes a product to the neutral party. *NLRB v. Servette*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). In holding that a distributor to be within the proviso's reference to a "producer," the Supreme Court observed that the proviso was the "outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded" and therefore, the protection of the proviso was not intended to be "any narrower in coverage than the prohibition to which it is an exception." 377 U.S. at 55, 84 S.Ct. at 1104. In *Great Western Broadcasting Corp. v. NLRB*, 356 F.2d 434 (9th Cir. 1966), the Ninth Circuit held that a radio station that provided the service of advertising was a producer within the

meaning of the proviso. The *Great Western* court stated: "whatever difficulties an analytical dissection of the proviso may reveal, they are not to stand in the way of giving that proviso a scope commensurate with the section to which it is appended." 356 F.2d at 436–37. Finally, in *K&K Construction Co. v. NLRB*, 592 F.2d 1228 (3d Cir. 1979), the Third Circuit assumed that the proviso would apply to an advertisement by a union publicizing that some work on a construction site had been performed by nonunion workers. Accordingly, I conclude that these defendants which are subject to the prohibitions in § 8(b)(4)(B) are also entitled to avail themselves of the protection of this proviso.

■ It is important to note the types of appeals that come within the proviso. The proviso protects only appeals made by a means other than picketing. Regardless of how an appeal is made, the proviso will not protect it if it causes the stoppage of deliveries or pickups at the secondary (neutral employers') site. 29 U.S.C. § 158(b)(4). The proviso protects appeals that would otherwise violate § 8(b)(4) because they are "coercive." A coercive appeal is one that encourages consumers to completely boycott the neutral employer rather than just the product of the primary employer (struck product). Appeals limited to the struck product were held by the Supreme Court not to violate § 8(b)(4) so that they do not need the protection of the proviso. *See NLRB v. Fruit & Vegetable Packers (Tree Fruits Labor Rel. Comm.)*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964); *cf. NLRB v. IBEW*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (section 8(c) does not apply in a § 303 action).

The plaintiff contends that the newspaper ads in this case violate the act and are outside the proviso based upon the fact that (1) the ads mentioned ARC but not the primary employers and (2) the ads mentioned ARC regardless of their failure to mention the primaries. The plaintiff's contentions are without merit because (1) they fail to recognize that the proviso protects coercive appeals and (2) they fail to differ-

entiate the rules applicable to picketing from the rules applicable to other means of communication.

Plaintiff's first objection is that the publicity failed to mention the primary employers. If the message had been carried on picket signs, the absence of the primary employers' identity would have violated 8(b)(4) because it would seem to urge a complete boycott of the neutral employer. Because the message was carried in the newspapers and not on picket signs, however, the publicity proviso may be invoked to absolve the defendants. As I have stated above, the publicity proviso exists to protect appeals which otherwise violate § 8(b)(4). Thus, the absence of the name of the primary employers does not deprive it of the protection of the publicity proviso.

Plaintiff also argues that because the "product" of the nonunion contractors merged into the ARC complex, the ads' appeal must have been one to boycott ARC because it would have been impossible for consumers to boycott the contribution of nonunion workers without boycotting all of the ARC complex. The plaintiff relies upon cases where unions picketed a neutral employer who sold a so-called "merged product."

The merged product cases are exceptions to the Supreme Court's holding in *Tree Fruits.* In *Tree Fruits,* the Supreme Court held that the unions do not violate § 8(b)(4) when they picket a secondary site urging a boycott of the product of a primary manufacturer, the so-called struck product, which is offered for sale by a neutral employer at the secondary site. Subsequent cases recognized that the *Tree Fruits* decision assumed that the struck product represented only a fraction of the business of the neutral employer and that it was possible to boycott the struck product without completely boycotting the neutral employer. See *K&K Construction Co. v. NLRB,* 592 F.2d 1228, 1232 (3d Cir. 1979). Thus in *Honolulu Typographical Union No. 37 v. NLRB,* 401 F.2d 952 (D.C.Cir.1968), the Court of Appeals for the District of Columbia held *Tree Fruits* inapplicable where the struck product had become an integral part of the retailer's entire offering, so that the product boycott of necessity encompassed the entire business of the secondary employer. *See also American Bread Co. v. NLRB,* 411 F.2d 147 (6th Cir. 1969) (picketing outside sandwich shop that urged boycott of bread used inside was not protected by *Tree Fruits* holding). In *K&K Construction Co. v. NLRB,* our court of appeals held that the merged product doctrine applies when a union which has a dispute with a subcontractor pickets a construction site where the subcontractor did work which became an integral part of the buildings under construction. 592 F.2d at 1232–33.

These cases though controlling on plaintiff's claims based upon the picketing of the ARC site are inapplicable to appeals made in the newspaper. The plaintiff has ignored the special restrictions placed upon picketing by our labor laws. As the Third Circuit explained in *K&K Construction,* "[p]icketing consists of more than mere publicizing; it includes patrolling as well. Although the message may be protected, the patrolling may be regulated." 592 F.2d at 1234. With respect to these newspaper ads, we are dealing with a message only. The publicity proviso which would have been inapplicable if the appeals had been made by picketing, does protect the newspaper appeals even if, applying "merged product doctrine" logic, they were appeals for a complete boycott of the ARC premises.

▮ The plaintiff contends that the defendants did not know whether the primary employers were paying below area standards and therefore, should not be entitled to the protection of the proviso. Unions which appeal to the public based upon an alleged violation of area standards must have a reasonable basis for believing that the standards are being violated. *See Helgesen v. International Association of Bridge,* 548 F.2d 175, 182 (7th Cir. 1977) (sufficient foundation for area standards allegations where union had a "not insubstantial" basis to believe the standards were being violated); *cf. NLRB v. International*

*Union of Operating Engineers, Local 571,* 624 F.2d 846, 849 (8th Cir. 1980) (union was not engaged in area standards picketing where there was no evidence of a bona fide attempt to determine if primary employer paid standard); *NLRB v. Building and Construction Trades Council of Delaware,* 578 F.2d 55, 58 (3d Cir. 1978) (no area standards picketing where union had no information about primary employer's wages).

The former president of BCTC stated that the unions determined that area standards were being violated based upon ten to fifteen years of experience and discussions with two of the contractors, conversations between union employees and employees of the nonunion employers. In addition, after the pickets were in place some discussions took place between BCTC and the owner of ARC. The plaintiff does not seem to challenge the reasonableness of the union's belief but rather than the union did not rely on information solicited from the primary employers. The plaintiff has no authority for this position. It appears from the uncontested facts in the record that *at the time the newspaper ads were placed* the union had a reasonable belief that these primary employers did not pay the area standards. Thus, there are no genuine issues of fact for trial and the defendants are entitled to judgment as a matter of law on this issue.

■ I have also considered the plaintiff's state law claims as they relate to the placement of the newspaper ads. In light of my decision to grant partial summary judgment for the defendants on the part of plaintiff's case based upon the newspaper ads, I also have decided in the exercise of my discretion not to retain the plaintiff's state law claims to the extent that they are based upon the newspaper ads. Because it would embroil trial in facts relating to the ads which otherwise would not be in issue and because combining state tort law with the federal law that applies to other portions of the case would lead to jury confusion, it is not in the interests of judicial economy and fairness to the litigants to retain the pendent state claim.

*Plaintiff's Claims Based Upon Picketing and Alleged Threats of Fines*

The plaintiff contends that the defendants violated § 8(b)(4)(B) by picketing the ARC complex and threatening union members with fines if they crossed the picket lines all in pursuit of a prohibited secondary objective. The plaintiff contends the defendant's activities were intended to convince first, union members and then, consumers to boycott the site so that pressure would be applied to ARC to cease doing business with the primary employers. The defendant denies that any union member was threatened with a fine and argues that the picketing was lawful primary activity.

■ Picketing by employees engaged in a primary dispute which takes place at property owned by a neutral employer where both union and nonunion employees are at work is called common-situs picketing. It may be lawful if primary employees are working on the site at the time the picketing takes place. R. Gorman, *supra,* at 251. Special rules apply to the common-situs situation, developed to accommodate the conflicting interests of unions which have disputes with primary employers at the common-situs and the interests of neutral employers at the site who wish to remain outside the primary labor dispute. The test for when common-situs picketing will be considered primary picketing, and therefore lawful, was first enunciated by the NLRB in *Sailors' Union of the Pacific (Moore Dry Dock Co.),* 92 N.L.R.B. 547 (1950) and were favorably acknowledged by the Supreme Court in *Local 761, IUE v. NLRB (General Electric Co.),* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Under the *Moore Dry Dock* standards, picketing is presumed primary if

(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises;

(b) At the time of the picketing the primary employer is engaged in its normal business at the *situs*;

(c) The picketing is limited to places reasonably close to the location of the *situs*; and

(d) The picketing discloses clearly that the dispute is with the primary employer. R. Gorman, *supra*, at 251. Compliance with these rules raises only a presumption that picketing does not violate § 8(b)(4). A fact finder in a § 303 suit will look at other factors as well to determine whether an object of the picketing was really to induce the secondary employer to cease doing business with the primary employer. *See NLRB v. Local 825, A, B, C, D International Union of Operating Engineers*, 659 F.2d 379, 384 (3d Cir. 1981); *Gulf Coast Building & Supply Co. v. International Brotherhood of Electrical Workers, Local 480*, 428 F.2d 121 (5th Cir. 1970). Our court of appeals has cautioned against placing undue emphasis on the wording of picket signs to the exclusion of consideration of the circumstances. *K&K Construction Co. v. NLRB*, 592 F.2d 1228, 1233 n.3 (3d Cir. 1979).

The introduction of separate gates for different employees to use when entering the common-situs can impact upon how the *Moore Dry Dock* standards are applied. The concept of a "reserved gate" was first developed in situations where the union was picketing at a location occupied by a primary employer only. Primary employers established gates reserved for use by persons entering the primary premises who were not employees of the primary employer. Faced with a case where the union picketed the reserved gate as well as the main gate, the NLRB applied the *Moore Dry Dock* standards and found that they had been violated. *See Local 761, IUE v. NLRB (General Electric)*, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). The Supreme Court reversed the Board holding that picketing the reserved gate was unlawful only if the persons using the gate performed functions unrelated to the normal operations of the primary employer. *Id.* The reserved gate has been used in common-situs picketing where the owner establishes one gate reserved for employees of the primary employer and another "neutral" gate for use by employees of neutral employers. In the common-situs cases, the Board has continued to apply the *Moore Dry Dock* standards without consideration

of the "relatedness" test announced by the Supreme Court for primary situs cases. *See Building & Construction Trades Council of New Orleans*, 155 N.L.R.B. 319, enf'd sub nom. *Markwell & Hartz, Inc. v. NLRB*, 387 F.2d 79 (5th Cir. 1967), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

■ In this case, the *Moore Dry Dock* standards have been met. Yet some additional matters surrounding the picketing create factual issues on whether the defendants engaged in activities with the object of coercing the plaintiff to cease doing business with the primary employers. The *Moore Dry Dock* standards are only helpful evidentiary standards. Compliance with them does not insulate the picketing from § 8(b)(4). In this case, the present record contains enough contraindications to preclude me from concluding based upon compliance with *Moore Dry Dock* that the defendants did not engage in prohibited secondary activity. For example, despite the fact that a neutral gate was established for use by union employees, members of Local 1174 did not come to work at the site. Members of Local 401 refused to come to work, even after their union agreed in settlement of an unfair labor charge to post a notice directing them to do so. It is well established that a neutral employer may "by the use of separate gates for the purpose of ingress to and egress from the jobsite, lawfully force the union to picket only those separate." *NLRB v. Local 825*, at 386. If the neutrality of the D&M gates was respected by the pickets, a substantial question remains unanswered: why the members of Locals 1174 and 401 did not report to the job. The plaintiff contends that the members were threatened with fines. The plaintiff will offer at trial the testimony of the owners of D&M and of ARC to this effect.

Although the defendants might have been justified in fining members who crossed a lawful picket line, *see* Annot., 47 ALR Fed. 669 (1980), the presence of the allegedly neutral gate and a genuine issue

about the legality of the picketing prohibit me from concluding that threats if made did not violate the act.

In light of the fact that compliance with *Moore Dry Dock* is not conclusive, that the members of Locals 1174 and 401 failed to work at the ARC site despite the alleged presence of a valid neutral gate, and the existence of a genuine issue of fact whether threats of fines were made, I conclude that on the present record I can state as a matter of law whether the defendants were engaged solely in legitimate primary activity or had prohibited secondary objectives.

*Plaintiff's Claims Against Local 1174*

Local 1174 has moved for summary judgment on the ground that the plaintiff has no evidence to link it to the events in a way that would impose liability upon it. Local 1174 contends that to the extent that its members participated in the underlying events they did so as members of BCTC. The Local also contends that its delegate to the BCTC did not vote or ratify the vote to picket the ARC premises and that the union itself never picketed ARC or threatened its members for crossing the picket lines.

■ Labor organizations are bound by the actions of their agents. 29 U.S.C. § 185(b). Moreover, "the question of whether the specific acts performed were actually authorized or subsequently ratified [is] controlling." *Id.* § 185(e). In this case, it is undisputed that all members of Local 1174 refused to enter the ARC premises even when a neutral gate allegedly had been established for them. In addition, Charles Marcon's testimony may be understood by the fact finder to allege that Local 1174 members were threatened with fines. *See* Affidavit of Marcon. The deposition of Sweeney creates a genuine issue whether or not the Business Agent of Local 1174 to BCTC voted to picket at the site. Deposition of Sweeney at 12 and 14. If he did vote to picket, it is a question of fact whether he did so as an agent of Local 1174. In addition, evidence in the record reveals that the assistant business manager of Local 1174 supervised all union members on the picket line, not just the members of

Local 1174. Deposition of Sweeney at 69. Thus, on the present record there is an issue of fact whether enough of a nexus exists between the activities at the ARC site and Local 1174 to impose liability upon it.

For the reasons stated above, summary judgment will be granted in part and denied in part.